(No. 46670.—

THE SERBIAN EASTERN ORTHODOX DIOCESE FOR THE UNITED STATES OF AMERICA AND CANADA *et al.,* Appellees, v. DIONISIJE MILIVOJEVICH *et al.,* Appellants.

*Opinion filed March 24, 1975.—Rehearing denied May 29, 1975.*

SCHAEFER, J., took no part.

John F. Grady, Leo J. Sullivan III, Richard J. Smith, Michael K. Noonan, and William A. Holmquist, all of Waukegan (Sullivan & Smith, Ltd., and Snyder, Clarke, Dalziel, Holmquist & Johnson, of counsel), for appellants.

Albert E. Jenner, Jr., Keith F. Bode, Peter A. Flynn and Thomas J. Karacic, all of Chicago, and Henry D. Fisher, of Waukegan (Jenner & Block and Katz, Karacic & Helmin, both of Chicago, and Hall, Meyer, Fisher, Holmberg, Snook & May, of Waukegan, of counsel), for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This is a direct appeal granted under Supreme Court Rule 302(b) (50 Ill.2d R. 302(b)) from a judgment of the circuit court of Lake County principally involving a dispute over the control of the Serbian Eastern Orthodox Diocese for the United States of America and Canada (hereinafter the American-Canadian Diocese or the Diocese) and the property and assets of that diocese. The parties, as they are presently constituted, are as follows:

| Plaintiffs: | Defendants: |
|---|---|
| Bishop Firmilian Ocokoljich | Bishop Dionisije Milivojevich |
| Bishop Gregory Udicki | Serbian Orthodox Monastery of St. Sava (monastery corporation) |
| Bishop Sava Vukovich | |
| Serbian Eastern Orthodox Diocese for the United States of America and Canada (the religious body in this country) | Serbian Eastern Orthodox Diocese for the United States of America and Canada (an Illinois religious corporation) |

Plaintiffs sought, in part, to have the trial court find that Bishop Dionisije had been removed as bishop of the Diocese, that the Diocese had been reorganized into three new dioceses, and that the three bishops be granted control of the Diocese and its property. Defendants filed a counterclaim seeking, among other relief, an injunction to prevent the plaintiffs from interfering with the assets of the defendant corporations. The circuit court held, in pertinent part, that Bishop Dionisije had properly been removed as bishop of the American-Canadian Diocese, that the reorganization of the Diocese into three new dioceses was illegal and invalid, and that only Bishop Firmilian as the duly appointed administrator of the Diocese could exercise authority over the Diocese and its property. Both plaintiffs and defendants appeal the trial court decision.

This case was originally filed in 1963 by the present

defendants, and the plaintiffs countered by filing a separate complaint. Both parties sought the same relief as was stated above. The trial court consolidated the actions and, based upon the pleadings, depositions and affidavits, granted the defendants herein summary judgment and dismissed the complaint of the plaintiffs. On appeal, the appellate court reversed the summary judgment and the order dismissing the complaint, and remanded the cause with directions for a full hearing on the merits. (*Serbian Eastern Orthodox Diocese for United States of America and Canada v. Ocokoljich,* 72 Ill. App. 2d 444, *appeal denied,* 34 Ill.2d 631.) On remand and over defendants' objection, the trial court allowed the Serbian Eastern Orthodox Diocese for the United States of America and Canada, the religious body in this country, to be designated a party plaintiff.

The similarity of certain named parties involved in this appeal requires some clarification prior to any understandable recitation of the facts. In addition to the last-named plaintiff and the last-named defendant as previously set forth, there is the entity which is the subject of this controversy, the Serbian Eastern Orthodox Diocese for the United States of America and Canada (the American-Canadian Diocese). The trial court on remand made certain findings of fact as to the existence of these parties, namely, that the Illinois religious corporation is a secular arm of the American-Canadian Diocese, and that the religious body in this country is a religious body duly organized and existing since 1921. The trial court, thus, found that the religious body in this country was synonymous with the American-Canadian Diocese. We conclude, however, that these findings are contrary to the manifest weight of the evidence, and they are, therefore, set aside. (*Turner v. Board of Education,* 54 Ill.2d 68, 72-73; *Kenny Construction Co. v. Metropolitan Sanitary District,* 52 Ill.2d 187, 196.) It is unnecessary at this point to relate the facts which form the basis of our determina-

tion, since the factual recitation which follows amply discloses that basis. The American-Canadian Diocese and the Illinois religious corporation (the last-named defendant) are one and the same as of the time of the Diocese's incorporation in May, 1935. If a distinction is to be made between the organizational entity of the Diocese and the individual church members of the Diocese when viewed as a common group, the latter could properly be referred to as a religious body. We do not infer, however, that this latter entity is represented by any of the plaintiffs in this action. The subject of this controversy and a party defendant is the American-Canadian Diocese organized as an Illinois religious corporation.

The complete factual background essential for an understanding of this case is not in all respects certain, since the parties are in dispute concerning it, and the trial court entered its findings of fact only as to those facts upon which it based its decision. We will recite the complete factual background as we understand it from the record and the briefs submitted by the parties. However, as to the testimony of the numerous witnesses in the trial court, we will recite only that testimony we deem necessary for a complete determination of the issues on appeal.

In the 1890's, persons of Serbian descent migrated to North America, where they formed completely autonomous religious congregations throughout the United States and Canada. Until 1920 these Serbian Orthodox churches were under the jurisdiction of the Russian Orthodox Church, the oldest Orthodox church in this hemisphere. The Russian Orthodox Church, however, was burdened with its own requirements and was unable to care for the local Serbian needs. The minutes of early meetings of Serbian priests and people held in 1913 and 1916 indicate a strong desire by these people to have their churches in America under the jurisdiction of the Serbian Orthodox Church with its See in what is now Belgrade,

Yugoslavia.

In 1913 a meeting of Serbian priests and people was called for the purpose of organizing the Serbian Orthodox Church in North America. During this meeting a constitution was drafted and accepted. Article 4 of this constitution provided that the Serbian Orthodox Church in the United States was to have its own Church National Representation and Church National Governing Body and that it would govern autonomously in matters of church, school, education and property.

In 1916 a Serbian Priests' Assembly was held and presided over by Bishop Evdokim of the Russian Orthodox Church. Business and problems facing the Serbian churches in America were discussed and resolved. A "Normal Constitution for the North American Orthodox Diocese" of 1909, apparently a constitution taken from the Russian Orthodox Church, was accepted by the priests' assembly with the necessary revisions to delete the references to the Russian Orthodox Church and refer instead to the Serbian Orthodox Church. It was also decided that several paragraphs would be added to this constitution to describe the duties of the Bishop's Aides. The 32 Serbian Orthodox parishes existing in the United States at the time of this meeting were divided into 4 presbyteries or divisions: Eastern, Middle, First Western, and Second Western. The Bishop's Aides were four Serbian priests elected to accept jurisdiction over the four presbyteries and to act as mediators between the bishop and the people.

In 1917 the Russian Orthodox Church sent Father Mardary Uskokovich (a Serbian educated in Russian Orthodox seminaries) to America with instructions to organize an independent Serbian diocese. Four years later the Holy Assembly of Bishops of the Serbian Orthodox Church sent a delegation to America to determine the status of the Serbian parishes. Apparently as a result of Father Mardary's efforts and the report of the delegation, the Serbian Orthodox Church recognized that the neces-

sary structure was present in America for establishing a diocese, and designated a Serbian bishop to carry out the formal organization of a diocese. The designated bishop, however, did not become a permanent resident of the United States, and Father Mardary was appointed as Resident Administrator of the Diocese until his election as bishop of the Diocese by the Holy Assembly of Bishops in 1925.

In 1927 Bishop Mardary organized under the laws of Illinois a not-for-profit corporation named the Serbian Eastern Orthodox Diocese Council for the United States and Canada. The purpose of this corporation was to hold title to 30 acres of property in Libertyville, Illinois, which the bishop had purchased in 1924. The charter of this corporation was permitted to lapse, and, shortly before Bishop Mardary's death in 1935, the American-Canadian Diocese was incorporated pursuant to provisions of the Illinois Religious Corporation Act (Ill. Rev. Stat. 1973, ch. 32, pars. 176 through 188) under the name of the Serbian Eastern Orthodox Diocese for the United States of America and Canada.

Acting under his authority as diocesan bishop, Bishop Mardary called the First Church National Assembly meeting, also known as a Sabor, for September 1, 1927. The invitation to this assembly was sent to all of the known Serbian Orthodox churches in the United States and Canada with the stated purpose of uniting them under one constitution. At the assembly meeting the constitution of the Serbian Orthodox Diocese for the United States of America and Canada was drafted and adopted.

Article 1 of the constitution provides that the American-Canadian Diocese "is considered ecclesiastically-judicially as an organic part of the Serbian Patriarchate in the Kingdom of Yugoslavia." Article 3 states that "the jurisdiction of the Serbian Orthodox Diocese *** includes the entire political territory of the United States of America and Canada, which as such *by its geographical*

*location enjoys full administrative freedom and according-
ly, it can independently regulate and rule the activities of
its church, school and other diocesan institutions and all
funds and beneficiaries, through its organs,* but in accord-
ance with the laws of the constitution and in agreement
with the laws of the United States and Canada." (Emphasis
added.) Other pertinent provisions of the constitution
provide that the bishop of the American-Canadian Diocese
is appointed by the Holy Assembly of Bishops of the
Serbian Patriarchate (article 9). When the seat of the
diocesan bishop is vacated, the administration of the
Diocese in spiritual and administrative matters is upheld by
the Diocesan Ecclesiastical Court and the Diocesan Council
until the appointment of an administrator by the Serbian
Patriarch (article 13). The Diocesan National Assembly is
the highest legislative and administrative authority of the
American-Canadian Diocese with its executive and admini-
strative organ being the Diocesan Council (article 5). The
Diocesan National Assembly, which meets every third year
in the month of September or on a day designated by the
diocesan bishop (article 20), is composed basically of two
delegates from every Serbian church-school congregation,
all Serbian clergy, the diocesan bishop and the Diocesan
Council (article 16). The diocesan bishop is the president
of the Diocesan National Assembly (article 22) and the
Diocesan Council (article 30). A function of the Diocesan
National Assembly is to decide on changes and amend-
ments to the constitution "with the approval of the Holy
Bishops' Assembly of the Serbian Patriarchate." Article
23.

The constitution further provides that the property of
the individual church-school congregation belongs exclu-
sively to that congregation with no diocesan rights to it
(article 147). All property owned by the American-
Canadian Diocese is to serve "exclusively for the purpose
designated by the statutes of this constitution and cannot
be used for any other purpose." Article 149.

Following its adoption by the Diocesan National Assembly, the constitution was submitted for approval to the Holy Assembly of Bishops of the Serbian Orthodox Church. In 1928 the Holy Assembly approved the "autonomous administration" of the American-Canadian Diocese, but struck an initial provision which provided that the Diocesan National Assembly would elect its own bishop. It inserted the present article 9, which provides that the Holy Assembly appoints the diocesan bishop. The Holy Assembly also insisted that, as a condition for approval, all amendments to the constitution initiated only by the Diocesan National Assembly would require the approval of the Holy Assembly. The diocesan constitution, as then approved by the Holy Assembly of Bishops, remains, in substance, in force and effect today. It is undisputed that the Diocese thereby became the only diocese in the Serbian Orthodox Church with its own constitution.

In 1945, the property located in Libertyville, which had come to be called the St. Sava Monastery, was transferred to an Illinois not-for-profit corporation organized under the name of the Serbian Orthodox Monastery of St. Sava (monastery corporation). The bylaws of this corporation provide that it is an autonomous Serbian Church institution, and that it "possesses its own property which cannot be disposed of, sold, mortgaged or otherwise conveyed by any Serbian Church authority, without the consent and approval of the Diocesan Council, headed by the Bishop and the Diocesan Church convention." (Bylaw 2.) They further provide that the president of the Board of Directors is the canonical bishop of the Diocese "received as such by the Diocesan Council *** Church Court and *** Convention." (Bylaw 6.) In addition to the monastery corporation, two other not-for-profit corporations organized under the respective laws of California and Pennsylvania hold title to large parcels of property located in these two States.

The Serbian Orthodox Church with its See in Bel-

grade, Yugoslavia, is one of the 14 autocephalous churches resulting from the great schism in 1054 when the universal Christian church was divided into the churches of the west (the Roman Catholic Church) and the churches of the east (the Orthodox Church). In 1931 the Serbian Orthodox Church adopted a constitution which was substantially revised in 1947 due to changes in its relationship with the communist government of Yugoslavia. Subsequent amendments to the revised constitution are not pertinent to this controversy except for the amendment of May 10, 1963.

The Serbian Orthodox Constitution provides, in pertinent part, that the Serbian Orthodox Church is autocephalous and governs and regulates independently all of its religious affairs, and that it maintains dogmatic and canonical unity with all other Orthodox churches (article 1). The church has the rank of Patriarchate (article 2). Article 10 states that in the Serbian Orthodox Church there are six levels of church hierarchical and administrative authorities, bodies and organs. The highest two levels are relevant here. The first level consists of the Patriarch, Holy Bishop's Council and Holy Synod, High Ecclesiastical Court, Patriarchal Council and Patriarch Board. The second level consists of the diocesan bishop, diocesan ecclesiastical court, diocesan council and executive board. Article 12 states that the Serbian Orthodox Church is episcopal, with its main administrative division composed of dioceses, both in respect to church hierarchal and church administrative aspects. Article 14 lists 24 dioceses which are "the dioceses in the Serbian Orthodox Church." Article 15 then provides that in addition to those dioceses already mentioned there are, "under the jurisdiction of the Serbian Orthodox Church in spiritual and hierarchical aspect," dioceses outside the country. Among those listed is "The Serbian Orthodox Church in the United States of America and Canada, with its seat in Chicago or in the monastery of St. Sava, at Libertyville, Illinois." Article 16 states that "[d]ecisions of establish-

ing, naming, liquidating, reorganizing, and the seat of the dioceses *** are decided upon by the Holy Council of Bishops, in agreement with the Patriarchal Council."

The church's governing functions are divided among three entities. The Holy Assembly of Bishops, also referred to as the Holy Bishop's Council, meets once a year and is the legislative body composed of the bishops of the various dioceses (articles 57, 69). The Holy Synod of Bishops is the executive body composed of four bishops and the Patriarch (articles 59, 70). The Patriarch, who is the presiding officer of both the Holy Assembly and the Holy Synod, is also a bishop and is considered the "first among equals."

The Supreme Ecclesiastical Court supervises the judicial authority of the church (article 7). However, special judicial authority is vested in the Holy Synod and the Holy Assembly for particular cases. Articles 57, 59.

In 1961 the Serbian Orthodox Church adopted a revised penal code for Ecclesiastical Courts which detailed the offenses, procedures and punishments of the church. The provisions of this code relevant to the issues raised on appeal will be discussed as they are pertinent.

Bishop Dionisije Milivojevich was elected Bishop of the American-Canadian Diocese in 1939 by the Holy Assembly of Bishops. As early as 1951 Bishop Dionisije requested the Patriarch and the Holy Assembly of Bishops to appoint assistant or vicar bishops to the American-Canadian Diocese. The Diocese, with its church-school congregations, was expanding, and Bishop Dionisije believed that the geographical boundaries of the Diocese should be increased by the addition of South America. These requests and similar requests continued until 1960, when the Diocesan National Assembly formed the opinion that the Diocese should be elevated to the rank of Metropolia and that two or three vicar bishops should be appointed under Bishop Dionisije. In the spring of 1962 a delegation from the Diocese was sent to the Patriarchate to

discuss this matter, and on June 12, 1962, the Holy Assembly of Bishops directed the Holy Synod to appoint a delegation to visit the United States and study the proposals. Bishop Dionisije made it quite clear in a letter to the Patriarch on July 30, 1962, that he was opposed to any reorganization of the Diocese into several dioceses as had previously been suggested. Bishop Dionisije expressed doubt that the people of the Diocese would accept such a division.

Tangential to the issue of the reorganization of the Diocese was a second issue—the charges and accusations against Bishop Dionisije for personal misconduct. As early as his appointment as diocesan bishop, and throughout his administration, letters were written to the Holy Synod challenging Bishop Dionisije's fitness to serve as bishop and control the Diocese. Consequently, the delegation appointed in June, 1962, by the Holy Synod was also instructed to make a study of the charges and accusations against Bishop Dionisije.

The delegation arrived in September, 1962, and visited throughout the Diocese for approximately three months. Among its pertinent recommendations, the delegation advised the Holy Synod that vicar bishops should be assigned to the American-Canadian Diocese and that a commission should be appointed to investigate the accusations against Bishop Dionisije.

On May 10, 1963, the Holy Assembly of Bishops met and at its morning session considered the complaints against Bishop Dionisije that had been sent to the Holy Synod and those that had been brought back by the 1962 delegation. It recommended that the Holy Synod initiate disciplinary proceedings against Bishop Dionisije. The Holy Assembly then recessed its meeting while the Holy Synod met, suspended Bishop Dionisije and appointed Bishop Firmilian, who held the rank of Archmandrite, as administrator of the American-Canadian Diocese. The Holy Assembly then resumed its meeting and, purporting to act

upon the basis of article 16, amended the constitution of the Serbian Orthodox Church by deleting mention of the American-Canadian Diocese from article 15. In substitution, the Holy Assembly added articles 15—1 to 15—3, which attempted to establish in the territory of the American-Canadian Diocese three new dioceses: the Middle Western, the Western and the Middle Eastern. Bishop Dionisije, still under suspension, was transferred to the Middle Western Diocese. Seven days after this reorganization, the Holy Synod appointed as temporary administrators for the respective new dioceses Archmandrites Firmilian, Gregory and Stevan.

Upon learning of the Holy Assembly's action, Bishop Dionisije refused to accept the division of the Diocese, since the reorganization purportedly disregarded the autonomy provided for in the diocesan constitution and the action was taken without the agreement of the people of the Diocese. He also refused to accept his suspension, claiming that he was not given a prior hearing as required by the constitution of the Serbian Orthodox Church or the church's penal code. The Diocesan Council informed the Holy Synod on June 9, 1963, that the rejection or acceptance of this division would be decided by the Diocesan National Assembly which was originally scheduled to meet in October, 1963, but which would now meet in early August to consider this question. The Diocesan Council also petitioned the Holy Synod to send a committee to investigate the charges against Bishop Dionisije as soon as possible, since no changes would be made in the administration of the Diocese prior to the Diocesan National Assembly meeting.

The Holy Synod appointed a commission to investigate the charges against Bishop Dionisije on June 13, 1963. The commission met with Bishop Dionisije on July 5, 1963, at which time the bishop repeated his refusal to recognize the division of the American-Canadian Diocese or his suspension, and demanded written copies of all the

charges against him. The commission, which had all the written charges in its possession, refused to show the bishop the charges on the basis that his refusal to accept the decisions of the higher church authorities was sufficient to establish his wrongful conduct without the need to investigate the personal charges against him. Prior to the meeting with Bishop Dionisije, the commission had made no investigation of any of the charges. Following this meeting, according to the testimony of one member of the commission, no investigation was conducted, while another member stated that the commission did receive further charges and spoke with some accusers. On July 6, 1963, the commission issued a proclamation which, in effect, stated that Bishop Dionisije was guilty of violations meriting the stripping of his episcopal rank and his excommunication from the church. The commission called upon all faithful Serbian people not to recognize the bishop, but rather to subordinate themselves to the administrators appointed by the Holy Synod.

On July 27, 1963, a special session of the Holy Assembly of Bishops met to consider the report given by a member of the investigation commission. The report recited, among other points, that Bishop Dionisije refused to accept the decisions of the Holy Assembly and Holy Synod dividing the one diocese into three, and suspending and removing him from governing the Diocese. It stated Bishop Dionisije would not recognize the court of the Holy Synod, nor would he recognize its judicial competence. The report recommended that Bishop Dionisije be deposed as diocesan bishop. The Holy Assembly voted to adopt the report and decision of the investigation commission. Bishop Firmilian was then elected bishop of the Middle Western Diocese.

In August, 1963, the emergency session of the Diocesan National Assembly met and issued a resolution refusing to recognize the validity of the decisions of the Holy Assembly and the Holy Synod regarding the division

of the American-Canadian Diocese. The National Assembly demanded the revocation of these decisions and adjourned its meeting until November to provide time for the Holy Assembly to withdraw its decisions. The Holy Assembly refused to reconsider, and in November the Diocesan National Assembly declared the American-Canadian Diocese completely autonomous and, as such, refused to comply with orders issued by the Holy Assembly. Moreover, the National Assembly reinstated those provisions of the diocesan constitution allowing the diocese to elect its own bishop and amend its constitution without prior approval of the Holy Assembly.

During September, 1963, the Holy Synod appointed a prosecutor to draft an indictment against Bishop Dionisije based upon the charges received by the Holy Synod and the investigation commission. The indictment was sent to the bishop, and in November he wrote to the Holy Synod requesting, under article 67 of the Penal Code, copies of the "enclosures" referred to in the indictment, which were the written complaints and letters from his accusers. The indictment, as evidenced by the enclosures submitted before the trial court, was based, in part, upon unsigned letters and complaints, many of which failed to state the time or place of the alleged offense. Bishop Dionisije also requested a 6-month extension to answer the indictment, because it was extremely long (37 pages), and he was recuperating from a recent automobile accident. In December, the Holy Synod refused the request to provide the "enclosures" but granted a 30-day extension in which to answer the indictment. Bishop Dionisije returned the indictment in January, 1964, stating that he could not answer the indictment without the "enclosures," that the Holy Synod and the Holy Assembly were violating the church penal code and constitution, that no investigation had been made, and that he could not bring his witnesses to Belgrade for trial.

On March 5, 1964, the indictment was verbally

amended by the prosecutor before the Holy Assembly to include the alleged offenses Bishop Dionisije had committed since the indictment was drafted. These alleged offenses were his joining with the Diocesan National Assembly to declare the American-Canadian Diocese completely autonomous and to set up a hierarchy outside of the Serbian Orthodox Church by the election and consecration of a diocesan-chosen bishop. By the Holy Assembly's decision, a copy of the amended indictment was not forwarded to Bishop Dionisije on the basis that he had refused to answer the first indictment. Bishop Dionisije also was not informed of this meeting. The Holy Assembly considered the original indictment and the amended indictment and found Bishop Dionisije guilty of all charges. He was divested of his episcopal and monastic ranks and returned to the status of a layman. Among those who voted on the question of Bishop Dionisije's guilt were bishops who had been either members of the 1962 delegation to the American-Canadian Diocese, which had received charges against Bishop Dionisije, or members of the 1963 investigation commission. The bishop who had been appointed prosecutor and who had drafted the indictment also took part in the vote.

The Holy Assembly at this time also declared the meeting of the Diocesan National Assembly in August and November, 1963, illegal, since it was presided over by the deposed Bishop Dionisije contrary to the constitution of the American-Canadian Diocese. It proclaimed that all decisions made by the National Assembly were unlawful and unconstitutional.

On remand of this case (72 Ill. App. 2d 444) to the trial court for a hearing on the merits, testimony was presented as to the correctness of the proceedings against Bishop Dionisije under the constitution and the penal code of the Serbian Orthodox Church.

Bishop Visarion Kostich, a member of the 1963 investigation commission and the author of the penal code,

testified that in 1963 the constitution of the Serbian Orthodox Church provided that canonical offenses of a bishop were to be judged by the Holy Synod as the court of "first instance" (article 70). Under article 69 the Holy Assembly of Bishops was to review appeals from the decisions of the Holy Synod, and it was the court of "second instance" in the case of a bishop. He stated, however, that though the constitution was in full force and effect in 1963, the provisions of article 70 were never applied. Moreover, he asserted that the Holy Assembly can take upon itself the privilege of adjudicating a case. Articles 69 and 70 have been amended since the proceedings against Bishop Dionisije to provide that canonical offenses of a bishop are judged by the Holy Assembly.

Bishop Visarion testified that the meeting of the Holy Assembly on July 27, 1963, did not consider the guilt or the charges against Bishop Dionisije. Rather, it considered whether Bishop Dionisije had violated his episcopal oath, which was interpreted as a condition required for a diocesan bishop under article 104 of the Serbian Orthodox Constitution. Bishop Visarion stated that no canonical verdict was rendered against Bishop Dionisije by the Holy Assembly, but a decision was made to relieve him of duties under article 111 of the constitution. Article 111 provides for removal of a diocesan bishop only by canonical verdict or for release upon proof of the loss of a condition under article 104. Bishop Visarion admitted that contrary to article 67 of the penal code no charges had been served on Bishop Dionisije prior to the July 27, 1963, meeting of the Holy Assembly. He stated that though the penal code requires that charges against an accused specify the time, place and manner of offense, certain allegations in the indictment against Bishop Dionisije failed to meet this requirement. The Holy Assembly, however, found that from the formal respects everything was in order, and that determination, Bishop Visarion maintained, was the Holy Assembly's right.

Bishop Visarion was recalled as a witness just over one year after his initial testimony in this case. At that time he testified that canonical offenses of a bishop are not judged in the first instance by the Holy Synod and that there is no provision in the constitution so requiring. He stated that the Holy Synod merely investigates the matter, examines the complaint, the indictment and the reply, and forwards the matter to the Holy Assembly. Bishop Visarion testified that article 65 of the penal code pertains to due process in penal matters, and it provides that unsigned submissions "shall not in any case be taken into consideration or process." He explained that this does not prohibit unsigned complaints from being considered by the investigators, but refers solely to documents submitted in court. He interpreted the penal code as not requiring that the complaints or documents identified in the indictment be forwarded to the accused, but as requiring that only the text of the indictment need be sent. Bishop Visarion further stated that Bishop Dionisije was not notified of or invited to the March 5, 1964, meeting of the Holy Assembly at which he was defrocked, nor was he served with a copy of the amended indictment upon which the Holy Assembly voted. He asserted that nothing was improper by this action since Bishop Dionisije had placed himself outside the church by refusing to take part in the proceedings. Bishop Visarion, who participated in the Holy Assembly meeting and signed the judgment against Bishop Dionisije, was of the opinion that it was not improper for a person to vote on the judgment though that person had participated in the investigation or was personally interested in the matter.

Father John Meyendorff, a priest of the Russian Orthodox Church and a professor of patristics and church history, testified for plaintiffs as an expert witness on ecclesiastical law and procedure. He stated that he examined the constitution of the Serbian Orthodox Church and the constitution of the American-Canadian Diocese, and

studied the orders and decisions of the Holy Assembly in 1963 respecting the suspension, deposition and defrockment of Bishop Dionisije. In his opinion Bishop Dionisije was properly suspended, deposed and defrocked. He was aware that the bishop who prepared the indictment against Bishop Dionisije participated in the March, 1964, meeting of the Holy Assembly at which Bishop Dionisije was defrocked. He stated, however, this made no difference in his opinion, because he knew of no church rule which prohibited this. In his view, the bishop had a duty to vote on an issue of such importance.

On cross-examination he testified that in forming his opinion he assumed the action against Bishop Dionisije was taken by men of good spirit under the rules of the Serbian Orthodox Church. He stated that having read the indictment against Bishop Dionisije he assumed the charges, by and large, were true, and that this assumption was part of the basis for his opinion. He further stated that a very important element in forming his opinion was the consensus among the Orthodox churches and bishops that the suspension, deposition and defrockment of Bishop Dionisije were valid. A suspension, he related, was a temporary measure of general practice under canon law when a person is called for trial. Father Meyendorff admitted he had not read and was not familiar with the penal code of the Serbian Orthodox Church. In giving his opinion he did not consider whether or not the proceedings against Bishop Dionisije complied with the penal code. Having familiarized himself with the exhibits, he stated that his impression was that the procedures were correct. He further testified that procedural rules are obligatory on the body which issued and applied them.

During cross-examination Father Meyendorff was asked to read a plaintiffs' exhibit which was a translation of an excerpt of the minutes of the meeting of the Holy Assembly on July 27, 1963, when Bishop Dionisije was deposed. In regard to this exhibit, which he referred to as

relating to the deposition of Bishop Dionisije, he stated the text definitely implied that the action against Bishop Dionisije was an ecclesiastical punishment or reprimand, though the text did not defrock or impose a penance on him. The exhibit indicated that the Holy Assembly sat in judgment of Bishop Dionisije and removed him as diocesan bishop for cause.

Father Meyendorff stated that a bishop is the defender and advocate of religious and doctrinal matters in the diocese. He testified that there were instances in Orthodox Church history where a bishop severed ties with the Orthodox Church in defense of his diocese. As an example of this, Father Meyendorff referred to his own church, the Russian Orthodox Church in America, which broke ties with the Patriarch of Moscow.

On redirect examination, Father Meyendorff stated that he had an opportunity during a recess in the trial to read two paragraphs of the penal code referred to in the deposition of Bishop Dionisije. While the record is unclear, the two paragraphs were apparently article 67, which deals with due process, and article 90, which covers the jurisdiction of the Holy Assembly and the Holy Synod in cases involving a bishop. Father Meyendorff testified that having read these paragraphs he still maintained that the proceedings against Bishop Dionisije were proper.

Father Zivan Stefanovic, who served as referent in legal matters to the Holy Synod from 1952 until 1965, and was editor of the *Herald,* an official journal of the Serbian Orthodox Church, from 1955 until 1965, was recognized by the court as an expert in the interpretation of the penal code. Father Stefanovic testified that in cases involving bishops the constitution envisioned the Holy Synod as the court of first instance and the Holy Assembly as the court of second instance. He referred to articles 70.35 and 69.27B of the constitution, which provide for these respective courts. Article 63 of the penal code provides for the judgment of a bishop and repeats, in

substance, the regulations of the constitution. He stated that article 63 requires the court of first instance to make a decision in the case under consideration. Article 64 of the penal code provides that the court which had jurisdiction for starting a procedure retains jurisdiction until the end of the procedure. He further stated that under article 69.27 of the constitution and article 78 of the penal code judgments of the court of first instance are appealable to the court of second instance. Father Stefanovic testified that under articles 77 and 124 of the constitution and articles 82.2 and 82.3 of the penal code certain members are prohibited from participating in the judgment of a case when the Holy Synod acts as a court. The same articles apply to the Holy Assembly when it acts as a court. These articles refer to persons who participated in the investigation, were personally interested or were disqualified from the deliberations.

Father Stefanovic said that article 67 of the penal code provides an accused with the right to receive the complaints against him. He testified that during 1963 and 1964 the Serbian Orthodox Church was in the practice of providing copies of the complaints to the accused under this article. During the 30 years he was involved in court proceedings, there was never an occasion when an accused was not provided with the written complaints to which he could reply. Father Stefanovic asserted that under article 67 of the penal code the proper procedure for conducting an investigation requires the investigator to set up a time and place for the accused and witnesses to appear before him at a hearing. The witnesses are called individually to explain what they saw, heard or experienced, and the accused is then given an opportunity, through the investigator, to request further explanation. Unsigned complaints, he stated, cannot even be given to the investigator under article 65 of the penal code.

Father Stefanovic testified he knew of no case in the Serbian Orthodox Church where a bishop was removed

from a diocese without his consent or agreement. He stated that under article 217 of the constitution a clergyman or bishop can be transferred into another parish or diocese only after the judgment of a church court, and under article 111 a bishop can be removed only by canonical verdict resulting from a trial by the Holy Synod in the first instance. He stated further that articles 216 and 217 of the constitution and article 55 of the penal code provide penalties for offenses of a serious nature, which include transfer to another place of service, and loss of a place of service for those who are not parish priests. Under article 218 of the constitution and the third paragraph of article 67 of the penal code, no one can incur any church penalty without a prior hearing. Father Stefanovic said that article 71 of the penal code mandates the steps the Holy Synod must take when it acts as a court. It must consider all documents and, on the basis thereof, vote first on the issue of guilt and, finally, on the question of punishment.

During his testimony Father Stefanovic related his contact with the proceedings against Bishop Dionisije. Among these incidents, he stated he was called by the Holy Synod on December 10, 1963, along with a theology professor to give an expert opinion as to the offenses of Bishop Dionisije. He was asked whether the written complaints should be furnished to Bishop Dionisije as he had requested. Father Stafanovic told the Holy Synod that the written complaints should be furnished, since the penal code and the practice in previous years dictated it. Following this occurrence, Father Stefanovic had no further contact with the proceedings until March, 1964, when he was told the decision of the Holy Assembly and was assigned to draft the formal judgment.

Father Stefanovic gave his opinion as to the proceedings against Bishop Dionisije. He stated that under the Serbian Orthodox Constitution and the penal code the Holy Assembly could not transfer Bishop Dionisije to a

newly created diocese without a previous hearing, investigation and judgment brought by the Holy Synod. The process of the investigation commission did not conform with the law of procedure, since the commission did not hold a hearing of witnesses or collect proof of the charges. The accusations and allegations against Bishop Dionisije were taken as evidence when, in fact, these complaints had to be proved. Moreover, Bishop Dionisije was not given an opportunity to answer all the accusations, nor did he receive proof of the charges which were used to describe his offenses and upon which the judgment was based. Father Stefanovic maintained that Bishop Dionisije could not be deposed from his diocese before the Holy Synod entered judgment that his transgressions were proved and that he was to be punished by deposition. Bishop Dionisije was not furnished with a copy of the amended indictment, which contained the most serious offenses, before it was submitted to the Holy Assembly. Father Stefanovic stated that even assuming the Holy Assembly was competent to judge Bishop Dionisije in the first instance, it should not have considered the amended indictment, since the prosecution did not follow the prescribed procedure. It was noted that the indictment itself provided on the first page that the Holy Synod was authorized under the constitution and the penal code of the Serbian Orthodox Church to judge in the first instance the case of Bishop Dionisije. Father Stefanovic concluded that the defrockment was improper because the Holy Assembly acted as the court of first instance in violation of article 70.35 of the Serbian Orthodox Constitution, and by this procedural violation Bishop Dionisije was precluded from having a court of second instance to which to appeal.

On cross-examination, in an apparent attempt to discredit Father Stefanovic's credibility, plaintiffs brought out that he was the subject of disciplinary proceedings by the Serbian Orthodox Church following his departure from Yugoslavia in 1965. During his cross-examination on the

penal code, Father Stefanovic made reference apparently to article 66, which provides, basically, that if a person charged with a violation refuses to participate in the proceedings, then it is considered that he acknowledges the charges against him and due process will be concluded without his participation.

Numerous persons testified at trial who purportedly had witnessed or accused Bishop Dionisije of personal misconduct. These persons had all been named in the indictment or the enclosures to it. While it is unnecessary to relate the content of this testimony, since the trial court did not base its decision on the alleged personal transgressions of Bishop Dionisije, we note that the majority of these witnesses testified that they had no knowledge of any personal misconduct by Bishop Dionisije, had not made any accusations against the bishop, and had never been interviewed by the 1963 investigation commission. Between this majority and the minority who did testify as to personal misconduct by Bishop Dionisije, there were factual disputes as to the occurrence of the alleged specific incidents. Certain members of this minority group admitted that some accusations they had made were not based on personal knowledge, but on information they had received from other people. Some members of this minority were clergy, and they admitted that they had previously been disciplined by Bishop Dionisije. And, finally, certain members conceded that they had never been interviewed by the 1963 investigation commission.

Three primary issues are raised in this appeal. Bishop Dionisije challenges the validity of his transfer, deposition and defrockment. Secondly, plaintiffs contend that the Holy Assembly of Bishops had the power to reorganize the American-Canadian Diocese into three new dioceses. And, finally, the American-Canadian Diocese and the monastery corporation, defendants herein, argue that the relationship between the Serbian Orthodox Church and the Diocese has been terminated by either the attempted reorganization of

the Diocese by the Holy Assembly of Bishops or by the November, 1963, resolutions of the Diocesan National Assembly. Antecedent to the first issue, and less specifically to the remaining issues, is the question whether the decision of the highest church authority can be reviewed by the civil courts.

Plaintiffs argue and defendant Bishop Dionisije does not dispute that the Serbian Orthodox Church is a hierarchical and episcopal church. Moreover, the parties agree that in cases involving hierarchical churches the decisions of the proper church tribunals on questions of discipline, faith or ecclesiastical rule, though affecting civil rights, are accepted as conclusive in disputes before the civil courts. (See *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666, 676; *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 74 L. Ed. 131, 137, 50 S. Ct. 5.) All parties maintain that the sole limitation on this rule, when civil courts may entertain the "narrowest kind of review," occurs when the decision of the church tribunal is claimed to have resulted from fraud, collusion or arbitrariness. (*Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 74 L. Ed. 131, 137, 50 S. Ct. 5; *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 447, 451, 21 L. Ed. 2d 658, 664, 89 S. Ct. 601.) Plaintiffs assert that they are unable to cite any case wherein a court has interjected itself into a dispute on this basis. And plaintiffs urge that the trial court was correct in its finding that Bishop Dionisije failed to prove that his suspension, transfer, deposition and defrockment resulted from fraud, collusion or arbitrariness.

Having reviewed the record, we find that Bishop Visarion's testimony as to the correct procedure for trial of a bishop was contradictory, and Father Meyendorff's opinion in regard to Bishop Dionisije's deposition and defrockment was premised upon an assumption which did not consider the penal code. Conversely, Father Stefano-

vic, who served as legal referent to the Holy Synod and was obviously viewed by it as a legal expert, stated that Bishop Dionisije's transfer, deposition and defrockment were in violation of the constitution and the penal code of the Serbian Orthodox Church.

We note that while Bishop Visarion viewed the Holy Assembly's action on July 27, 1963, as a "release" of Bishop Dionisije under article 111 of the constitution and not as a removal, other witnesses were not in accord. Father Meyendorff, a witness called by the plaintiffs, referred to the Holy Assembly's action as the deposition of Bishop Dionisije and his removal from his duties in the American-Canadian Diocese. Father Stefanovic also viewed the action as a removal from the Diocese. Moreover, plaintiffs argue in their brief that the action was a proper "removal" under the constitution and the penal code of the Serbian Orthodox Church.

Article 66 of the penal code provides that if a person charged with a violation refuses to participate, due process will be concluded without his participation. The application of this provision, however, must be viewed from the perspective that Bishop Dionisije refused to participate because he maintained that the proceedings against him were in violation of the constitution and the penal code of the Serbian Orthodox Church.

In determining the issue before us, this court has limited itself to the "narrowest kind of review," to what Justice Frankfurter referred to as "one aspect of the duty of courts to enforce the rights of members in an association, temporal or religious, according to the laws of that association." (*Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 122, 97 L. Ed. 120, 139, 140, 73 S. Ct. 143 (concurring opinion).) Similarly, this court recognized in *Schweiker v. Husser,* 146 Ill. 399, 415, 425, that the decisions of the highest church authority properly within the sphere of ecclesiastical matters are not binding upon civil courts if

"they are clearly and manifestly repugnant to the established laws" of the church authority, or "in clear and palpable excess of its own jurisdiction ***." Though this rule was expressed in *Schweiker* decades before the decision in either *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 74 L. Ed. 131, 137, 50 S. Ct. 5, or *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 447, 451, 21 L. Ed. 2d 658, 664, 89 S. Ct. 601, it is consistent with the limitation on judicial review enunciated by the United States Supreme Court in these later cases.

A detailed review of the evidence discloses that the proceedings resulting in Bishop Dionisije's removal and defrockment were not in accordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church. While plaintiffs have argued that the evidence demonstrated Bishop Dionisije's defiant and dissident attitude toward the Serbian Orthodox Church, this, nevertheless, is not a factor in determining whether the prescribed church procedures were followed in the proceedings against him. Accordingly, the trial court's finding that Bishop Dionisije's removal and defrockment were not the result of arbitrariness must be set aside as contrary to the manifest weight of the evidence. The question of Bishop Dionisije's suspension under church procedure has not been challenged, and there is no evidence of impropriety in regard to it. Thus, the trial court's finding in this matter will not be disturbed. We note, however, that article 219 of the Serbian Orthodox constitution provides for suspension until the verdict of the church court is rendered, and "the court is obligated to make a decision within a period of one year." Since no valid action to resolve this matter was effected by church authorities within this period, it would appear from the language of article 219 and the testimony of Father Meyendorf, previously set forth in relation thereto, that the suspension of Bishop Dionisije is not presently

effective. Moreover, because Bishop Dionisije's removal and defrockment were in violation of church procedure, consideration of the remaining charges need not be undertaken.

Plaintiffs maintain that the reorganization of the American-Canadian Diocese into three new dioceses was authorized by the constitutions of both the Serbian Orthodox Church and the American-Canadian Diocese. Plaintiffs' contention, however, rests upon the premise that the American-Canadian Diocese is no different from any other diocese over which the Serbian Orthodox Church has complete authority. The issue involved here was considered and resolved adversely to plaintiffs in both the appellate court and the trial court on remand. The appellate court opinion, which was based solely upon the pleadings, depositions and affidavits, properly disposed of this issue. 72 Ill. App. 2d 444, 458-59.

As recognized in *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L. Ed. 666, 670, the United States Supreme Court stated:

> "Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints. Conscious as we may be of the excited feeling engendered by this controversy, and of the extent to which it has agitated the intelligent and pious body of Christians in whose bosom it originated, we enter upon its consideration with the satisfaction of knowing that the principles on which we are to decide so much of it as is proper for our decision, are those applicable alike to all of its class, and that our duty is the simple one of applying those principles to the facts before us."

While the constitutions of the American-Canadian Diocese and the Serbian Orthodox Church deal primarily

with religious matters, they do contain clear and specific provisions concerning the relationship between the Diocese and the Serbian Orthodox Church as regards administrative autonomy. A consideration of these constitutions in regard to the "full administrative freedom" enjoyed by the Diocese does not in any way entangle this court in the determination of theological or doctrinal matters. (See *Maryland and Virginia Eldership of the Churches of God v. Church of God,* 254 Md. 162, 254 A.2d 162, *appeal dismissed,* 396 U.S. 367, 24 L. Ed. 2d 582, 90 S. Ct. 499.) The determination of this issue is made without the resolution of doctrinal questions and without extensive inquiry into religious polity. The fact that the provisions of the constitutions pertinent to this issue are interspersed with other provisions relating to religious rites and doctrines does not preclude judicial review. It is doubtful that there are many church constitutions, charters or documents concerning the relationship and rights between two religious bodies that cannot be said to contain provisions relating to religious rites or doctrines. Therefore, to hold that review is precluded would leave the principle expounded in *Gonzalez* and *Mary Elizabeth Blue Hull* without meaning.

The issue raised here is analogous to the first issue. Bishop Dionisije maintained the proceedings against him were not in accord with the requirements of the constitution and the penal code of the Serbian Orthodox Church. Here, the American-Canadian Diocese maintains the reorganization was in violation of the constitutions of the Diocese and the Serbian Orthodox Church. The determination of this issue, as with the first issue, is merely the enforcement of "the rights of members in an association *** according to the laws of that association." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in America,* 344 U.S. 94, 122, 97 L. Ed. 1120, 140, 73 St. Ct. 143 (Frankfurther, J., concurring opinion).

The early history of the Serbian Orthodox churches in America and of the American-Canadian Diocese itself manifested a clear intention to retain independence and autonomy in its administrative affairs while at the same time becoming ecclesiastically and judicially an organic part of the Serbian Orthodox Church. The constitution of the Diocese evidences and accomplishes this intent. Article 2 states that the Diocese is considered "ecclesiastically-judicially as an organic part" of the Serbian Patriarchate. The article recites no reference to administrative control by the Patriarchate, and, in point, article 3 provides that the Diocese "enjoys full administrative freedom" and can "independently regulate and rule" the activities of the church within the "entire political territory" of the United States and Canada.

The desire for administrative freedom is further indicated by the fact that initial provisions of the diocesan constitution, which the Holy Assembly would not accept as a condition for approval, provided that the Diocesan National Assembly would elect its own bishop and have the exclusive right to amend the constitution. The Diocese did not surrender its complete power in regard to this latter provision, for the Holy Assembly may only approve changes introduced and adopted by the Diocesan National Assembly. We conclude, as did the appellate court, that it is inconceivable that the Holy Assembly, which is without an express power to alter or amend the diocesan constitution, has an implied power to utterly revoke that constitution by decreeing that the Diocese ceases to exist.

The constitution of the Serbian Orthodox Church, adopted three years after the constitution of the American-Canadian Diocese was approved, is not contrary to this conclusion. Article 12 states that the church's main administrative division is the diocese in regard to both church *hierarchical* and *administrative* aspects. Article 14 states, "These are the Dioceses in the Serbian Orthodox Church," and then lists only those dioceses within Yugo-

slavia. The American-Canadian Diocese, prior to May 10, 1963, was listed in article 15, which, significantly, covered those dioceses "under the jurisdiction of the Serbian Orthodox Church in *spiritual* and *hierarchical* aspect." These two articles clearly distinguish between those dioceses completely subordinate to the Serbian Orthodox Church in both hierarchical and administrative matters and those dioceses subordinate in only the spiritual and hierarchical aspects. By the placement of the American-Canadian Diocese in article 15, the Serbian Orthodox Church recognized, in its own constitution, its jurisdiction over the Diocese only in spiritual and hierarchical concerns. Article 16 states that decisions regarding the establishment, liquidation, or reorganization of the dioceses are decided upon by the Holy Assembly in agreement with the Patriarchal Council. Plaintiffs have pointed to no statement or interpretation of article 16 by the Holy Synod, Holy Assembly, or the Patriarch that a liquidation or reorganization of a diocese is other than an administrative act, nor have we been able to find any. Defendants maintain that the "reorganization" of the Diocese was administrative, and plaintiffs contend, in a rather oblique argument, that it was both hierarchical and administrative. Even accepting plaintiffs' contention, the constitution of the Serbian Orthodox Church does not grant the Holy Assembly the sole power to "reorganize" the American-Canadian Diocese, and in this regard it is consistent with the constitution of the Diocese. For the above-stated reasons, we find that the division of the American-Canadian Diocese into three new dioceses by the Holy Assembly was "in clear and palpable excess of its own jurisdiction," and as such, it is not binding on civil courts. *Schweiker v. Husser,* 146 Ill. 399, 415, 425.

The American-Canadian Diocese and the monastery corporation maintain that the relationship between the Diocese and the Serbian Orthodox Church has been terminated by reason of the church's breach of the

contract between them or by reason of the parties' mutual repudiation. Plaintiffs assert that no contract ever existed, that the Diocesan National Assembly which proclaimed the Diocese completely autonomous was constitutionally illegal, and that the Diocese's attempt to proclaim its complete autonomy was violative of the constitutions of both the American-Canadian Diocese and the Serbian Orthodox Church. Defendants do not contend that the constitution of the Serbian Orthodox Church provides any authority under which the Diocese could proclaim autonomy. Moreover, the constitution of the Diocese states that any amendments adopted by the Diocesan National Assembly must be approved by the Holy Assembly of Bishops.

In considering this issue, a determination must first be made as to what is the actual relationship between the American-Canadian Diocese and the Serbian Orthodox Church. Reviewing the history of the Diocese, as disclosed by the record and the constitutions of the respective parties, we find that the relationship is more than a mere contract or compact. Rather, it is a relationship of religious unanimity wherein people of common faith joined with a recognized higher church organization to further the practice of their faith. The constitutions of the parties are simply the expressions of the temporal laws governing this religious union and are only a minor aspect of it. Actions which are contrary to these temporal laws are not a repudiation or an abrogation of the primary and basic relationship of religious unity.

The attempt of the Diocese to declare its complete autonomy is similar to the attempt of the Holy Assembly of Bishops to divide the Diocese. Both actions were contrary to their respective constitutions. Neither act, however, was a repudiation of the basic religious unanimity, thereby permitting the parties to abandon their union or to ignore the temporal laws governing their relationship.

Moreover, viewing this issue solely in regard to the respective constitutions, the parties recognize that neither provides for a unilateral withdrawal. As the action of the Holy Assembly in attempting to divide the Diocese was "in clear and palpable excess of its own jurisdiction," so also is the action of the Diocese in attempting to secede. Accordingly, the declaration of complete autonomy by the Diocese is not binding on civil courts. We do not infer, however, that the relationship existing between the American-Canadian Diocese and the Serbian Orthodox Church is the same type of relationship as exists between the Diocese and its respective church-school congregations.

Accordingly, the judgment of the circuit court of Lake County that Bishop Dionisije's deposition and defrockment were proper is reversed; the judgment that the division of the American-Canadian Diocese into three new dioceses was illegal and unenforceable is affirmed; and the judgment that the actions of the Diocesan National Assembly in November, 1963, amending the constitution of the Diocese are without force or effect is affirmed. The cause is remanded to the circuit court of Lake County for further proceedings not inconsistent with the views expressed herein.

*Affirmed in part and reversed*
*in part and remanded.*

MR. JUSTICE SCHAEFER took no part in the consideration or decision of this case.