SERBIAN EASTERN ORTHODOX DIOCESE FOR
THE UNITED STATES OF AMERICA AND
CANADA ET AL. *v.* MILIVOJEVICH ET AL.

No. 75-292.   Argued March 22, 1976—Decided June 21, 1976

BRENNAN, J., delivered the opinion of the Court, in which STEW-ART, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 725. BURGER, C. J., concurred in the judgment. REHNQUIST, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 725.

*Albert E. Jenner, Jr.*, argued the cause for petitioners. With him on the briefs were *Keith F. Bode, Robert L. Graham, Thomas J. Karacic*, and *Henry D. Fisher*.

*Leo J. Sullivan III* argued the cause for respondents. With him on the brief were *Richard J. Smith* and *Jerome H. Torshen.*[*]

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In 1963, the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church (Mother Church)

---

[*]*Don H. Reuben, Lawrence Gunnels*, and *James A. Serritella* filed a brief for the Catholic Bishop of Chicago as *amicus curiae*.

suspended and ultimately removed respondent Dionisije Milivojevich (Dionisije) as Bishop of the American-Canadian Diocese of that Church, and appointed petitioner Bishop Firmilian Ocokoljich (Firmilian) as Administrator of the Diocese, which the Mother Church then reorganized into three Dioceses. In 1964 the Holy Assembly and Holy Synod defrocked Dionisije as a Bishop and cleric of the Mother Church. In this civil action brought by Dionisije and the other respondents in Illinois Circuit Court, the Supreme Court of Illinois held that the proceedings of the Mother Church respecting Dionisije were procedurally and substantively defective under the internal regulations of the Mother Church and were therefore arbitrary and invalid. The State Supreme Court also invalidated the Diocesan reorganization into three Dioceses. 60 Ill. 2d 477, 328 N. E. 2d 268 (1975).[1] We granted certiorari to determine whether the actions of the Illinois Supreme Court constituted improper judicial interference with decisions of the highest authorities of a hierarchical church in violation of the First and Fourteenth Amendments. 423 U. S. 911 (1975). We hold that the inquiries made by the Illinois Supreme Court into matters of ecclesiastical cognizance and polity and the court's actions pursuant thereto contravened the First and Fourteenth Amendments. We therefore reverse.

## I

The basic dispute is over control of the Serbian Eastern Orthodox Diocese for the United States of America and Canada (American-Canadian Diocese), its property and assets. Petitioners are Bishops Firmilian, Gregory Udicki, and Sava Vukovich, and the Serbian Eastern

---

[1] The opinion of the Illinois Appellate Court in an earlier appeal is reported sub nom. *Serbian Orthodox Diocese* v. *Ocokoljich*, 72 Ill. App. 2d 444, 219 N. E. 2d 343 (1966).

Orthodox Diocese for the United States of America and Canada (the religious body in this country). Respondents are Bishop Dionisije, the Serbian Orthodox Monastery of St. Sava, and the Serbian Eastern Orthodox Diocese for the United States of America and Canada, an Illinois religious corporation. A proper perspective on the relationship of these parties and the nature of this dispute requires some background discussion.

The Serbian Orthodox Church, one of the 14 autocephalous, hierarchical churches which came into existence following the schism of the universal Christian church in 1054, is an episcopal church whose seat is the Patriarchate in Belgrade, Yugoslavia. Its highest legislative, judicial, ecclesiastical, and administrative authority resides in the Holy Assembly of Bishops, a body composed of all Diocesan Bishops presided over by a Bishop designated by the Assembly to be Patriarch. The Church's highest executive body, the Holy Synod of Bishops, is composed of the Patriarch and four Diocesan Bishops selected by the Holy Assembly. The Holy Synod and the Holy Assembly have the exclusive power to remove, suspend, defrock, or appoint Diocesan Bishops. The Mother Church is governed according to the Holy Scriptures, Holy Tradition, Rules of the Ecumenical Councils, the Holy Apostles, the Holy Faiths of the Church, the Mother Church Constitution adopted in 1931, and a "penal code" adopted in 1961. These sources of law are sometimes ambiguous and seemingly inconsistent. Pertinent provisions of the Mother Church Constitution provide that the Church's "main administrative division is composed of dioceses, both in regard to church hierarchical and church administrative aspect," Art. 12, and that "[d]ecisions of establishing, naming, liquidating, reorganizing, and the seat of the dioceses, and establishing or eliminating of position of vicar bish-

ops, is decided upon by the [Holy Assembly], in agreement with the Patriarchal Council," Art. 16.

During the late 19th century, migrants to North America of Serbian descent formed autonomous religious congregations throughout this country and Canada. These congregations were then under the jurisdiction of the Russian Orthodox Church, but that Church was unable to care for their needs and the congregations sought permission to bring themselves under the jurisdiction of the Serbian Orthodox Church.

In 1913 and 1916, Serbian priests and laymen organized a Serbian Orthodox Church in North America. The 32 Serbian Orthodox congregations were divided into 4 presbyteries, each presided over by a Bishop's Aide, and constitutions were adopted. In 1917, the Russian Orthodox Church commissioned a Serbian priest, Father Mardary, to organize an independent Serbian Diocese in America. Four years later, as a result of Father Mardary's efforts, the Holy Assembly of Bishops of the Mother Church created the Eastern Orthodox Diocese for the United States of America and Canada and designated a Serbian Bishop to complete the formal organization of a Diocese. From that time until 1963, each Bishop who governed the American-Canadian Diocese was a Yugoslav citizen appointed by the Mother Church without consultation with Diocesan officials.

In 1927, Father Mardary called a Church National Assembly embracing all of the known Serbian Orthodox congregations in the United States and Canada. The Assembly drafted and adopted the constitution of the Serbian Orthodox Diocese for the United States of America and Canada, and submitted the constitution to the Mother Church for approval. The Holy Assembly made changes to provide for appointment of the Diocesan Bishop by the Holy Assembly and to require Holy As-

sembly approval for any amendments to the constitution, and with these changes approved the constitution. The American-Canadian Diocese was the only diocese of the Mother Church with its own constitution.

Article 1 of the constitution provides that the American-Canadian Diocese "is considered ecclesiastically-judicially as an organic part of the Serbian Patriarchate in the Kingdom of Yugoslavia," and Art. 2 provides that all "statutes and rules which regulate the ecclesiastical-canonical authority and position of the Serbian Orthodox Church in the Kingdom of Yugoslavia are also compulsory for" the American-Canadian Diocese. Article 3 states that the "jurisdiction of the . . . Diocese . . . includes the entire political territory of the United States of America and Canada, which as such by its geographical location enjoys full administrative freedom and accordingly, it can independently regulate and rule the activities of its church, school and other diocesan institutions and all funds and beneficiencies, through its organs . . . ." Article 9 provides that the Bishop of the Diocese "is appointed by the Holy Assembly of Bishops of the Serbian Patriarchate"; various provisions of the constitution accord that Bishop extensive powers with respect to both religious matters and control of Diocesan property. The constitution also provides for such Diocesan organs as a Diocesan National Assembly, which exercises considerable legislative and administrative authority within the Diocese.

In 1927, Father Mardary also organized a not-for-profit corporation, the Serbian Eastern Orthodox Council for the United States and Canada, under the laws of Illinois. The corporation was to hold title to 30 acres of land in Libertyville, Ill., that Father Mardary had personally purchased in 1924. The charter of that corporation was allowed to lapse, and Father Mardary organized

another Illinois not-for-profit corporation, respondent Serbian Eastern Orthodox Diocese for the United States and Canada, under Illinois laws governing incorporation of hierarchical religious organizations. In 1945, respondent not-for-profit monastery corporation, the Monastery of St. Sava, was organized under these same Illinois laws, and title to the Libertyville property was transferred to it. Similar secular property-holding corporations were subsequently organized in New York, California, and Pennsylvania.

Respondent Bishop Dionisije was elected Bishop of the American-Canadian Diocese by the Holy Assembly of Bishops in 1939. He became a controversial figure; during the years before 1963, the Holy Assembly received numerous complaints challenging his fitness to serve as Bishop and his administration of the Diocese.

During his tenure, however, the Diocese grew so substantially that Dionisije requested that the Patriarch and Holy Assembly appoint bishops to assist him but to serve under his supervision. Eventually, the Diocese sought its elevation by the Holy Assembly to the rank of Metropolia, that South America be added to the Diocese, and that several assistant bishops be appointed under Dionisije. Dionisije specifically recommended that petitioners Firmilian and Gregory Udicki, and one Stefan Lastavica be named assistant bishops. A delegation from the Diocese was sent to the May 1962 meeting of the Holy Assembly in Belgrade to urge adoption of these reorganization proposals, and on June 12, 1962, the Holy Synod appointed a delegation to visit the United States and study the proposals. The delegation was also directed to confer with Dionisije concerning the complaints made against him and his administration over the years.

The delegation remained in the United States for three

months, visiting parishes throughout the Diocese and discussing both the reorganization proposals and the complaints against Dionisije. After completion of its survey, the delegation suggested to the Holy Synod the assignment of vicar bishops to the Diocese and recommended that a commission be appointed to conduct a thorough investigation into the complaints against Dionisije. However, the Holy Assembly on May 10, 1963, instead recommended that the Holy Synod institute disciplinary proceedings against Dionisije. The Holy Synod thereupon met immediately and suspended Dionisije pending investigation and disposition of the complaints. The Holy Synod appointed petitioner Firmilian, Dionisije's chief episcopal deputy since 1955 and one of Dionisije's candidates for assistant bishop, as Administrator of the Diocese pending completion of the proceedings.

The Holy Assembly thereafter reconvened and, acting under Art. 16 of the constitution of the Mother Church, reorganized the American-Canadian Diocese into three new dioceses—the Middle Western, the Western, and the Eastern—whose boundaries were roughly those of the episcopal districts previously created by Dionisije.[2] The final fixing of boundaries for the new dioceses and all other organizational and administrative matters were left to be determined by the officials of the old American-Canadian Diocese. Dionisije was appointed Bishop of the Middle Western Diocese and, seven days later, petitioners Archimandrites Firmilian, Gregory, and Stefan [3] were appointed temporary administrators for the new Dioceses.

---

[2] The Mother Church decided against creation of a "Metropolia" because it had not employed that organizational system and had not required one Bishop to serve under another.

[3] Stefan has since died, and the Holy Assembly appointed petitioner Sava Vukovich in his place.

Dionisije's immediate reaction to these decisions of the Mother Church was to refuse to accept the reorganization on the ground that it contravened the administrative autonomy of the Diocese guaranteed by the Diocesan constitution, and to refuse to accept his suspension on the ground that it was not effectuated in compliance with the constitution and laws of the Mother Church. On May 25, 1963, he prepared and mailed a circular to all American-Canadian parishes stating his refusal to recognize these actions, and on May 27 he issued a press release stating his refusal to recognize his suspension and his intent to litigate it in the civil courts. This refusal to recognize the Diocesan reorganization and his suspension as Bishop was again stated by Dionisije in a circular issued on June 3 and addressed to the Patriarch, the Holy Assembly, the Holy Synod, all clergy, congregations, Diocesan committees, and all Serbians in North America. He also continued to officiate as Bishop, refusing to turn administration of the Diocese over to Firmilian; in a May 30 letter to Firmilian, Dionisije repeated this refusal, asserted that he no longer recognized the decisions of the Holy Assembly and Holy Synod, and charged those bodies with being "communistic."

The Diocesan Council met on June 6, and Dionisije reaffirmed his refusal to turn over administration of the Diocese to Firmilian; he also announced that he had discharged two of his vicars general because of their loyalty to the Mother Church. The Council resolved at the meeting to advise the Holy Synod that the proposal to reorganize the Diocese into three dioceses would be submitted to the Diocesan National Assembly in August for acceptance or rejection. The Council also requested that the Holy Assembly promptly send a committee to investigate the complaints against Dionisije.

On June 13, the Holy Synod appointed such a commis-

sion, composed of two Bishops and the Secretary of the Holy Synod. On July 5, the commission met with Dionisije, who reiterated his refusal to recognize his suspension or the Diocesan reorganization, and who demanded all accusations in writing. The commission refused to give Dionisije the written accusations on the ground that defiance of decisions of higher church authorities itself established wrongful conduct, and advised him that the Holy Synod would appoint a Bishop as court prosecutor to prepare an indictment against him.

On the basis of the commission's report and recommendations, which recited Dionisije's refusal to accept the decisions of the Holy Synod and Holy Assembly and his refusal to recognize the court of the Holy Synod or its competence to try him, the Holy Assembly met on July 27, 1963, and voted to remove Dionisije as Bishop. The minutes of the Holy Assembly meeting and the Patriarch's letter to Dionisije informing him of the Holy Assembly's actions made clear that the removal was based solely on his acts of defiance subsequent to his May 10, 1963, suspension, and his violation of his oath and loss of certain qualifications for Bishop under Art. 104 of the constitution of the Mother Church.

The Diocesan National Assembly, with Dionisije presiding despite his removal, met in August 1963 and issued a resolution repudiating the division of the Diocese into three Dioceses and demanding a revocation by the Mother Church of the decisions concerning that division. When the Holy Assembly refused to reconsider, the Diocesan National Assembly in November 1963 declared the Diocese completely autonomous and reinstated the provisions of the Diocesan constitution that provided for election of the Bishop of the Diocese itself and for amendments without the approval of the Holy Assembly.

Meanwhile, the Holy Synod in October 1963 for-

warded to Dionisije a formal written indictment based on the charges of canonical misconduct. In November 1963, Dionisije responded with a demand for the verified reports and complaints referred to in the indictment and for a six-month extension to answer the indictment. The Holy Assembly granted a 30-day extension in which to answer, but declined to furnish verified charges on the grounds that they were described in the indictment, that additional details would be evidentiary in nature, and that there was no legal or canonical basis for forwarding such material to an accused Bishop.

Dionisije returned the indictment in January, refusing to answer without the verified charges, denouncing the Holy Assembly and Holy Synod as schismatic and pro-Communist, and asserting that the Mother Church was proceeding in violation of its penal code and constitution.

The Holy Synod, on February 25, 1964, declared that it could not proceed further without Dionisije and referred the matter to the Holy Assembly, which tried Dionisije as a default case on March 5, 1964, because of his refusal to participate. The indictment was also amended at that time to include charges based on Dionisije's acts of rebellion such as those committed at the November meeting of the National Assembly which had declared the Diocese separate from the Mother Church. Considering the original and amended indictments, the Holy Assembly unanimously found Dionisije guilty of all charges and divested him of his episcopal and monastic ranks.

Even before the Holy Assembly had removed Dionisije as Bishop, he had commenced what eventually became this protracted litigation, now carried on for almost 13 years. Acting upon the threat contained in his May 27, 1963, press release, Dionisije filed suit in

the Circuit Court of Lake County, Ill., on July 26, 1963, seeking to enjoin petitioners from interfering with the assets of respondent corporations and to have himself declared the true Diocesan Bishop. Petitioners countered with a separate complaint, which was consolidated with the original action, seeking declaratory relief that Dionisije had been removed as Bishop of the Diocese and that the Diocese had been properly reorganized into three Dioceses, and injunctive relief granting petitioner Bishops control of the reorganized Dioceses and their property. After the trial court granted summary judgment for respondents and dismissed petitioners' countercomplaint, the Illinois Appellate Court reversed and remanded for a hearing on the merits. *Serbian Orthodox Diocese* v. *Ocokoljich,* 72 Ill. App. 2d 444, 219 N. E. 2d 343, appeal denied, 34 Ill. 2d 631 (1966).[4]

Following a lengthy trial, the trial court filed an unreported memorandum opinion and entered a final decree which concluded that "no substantial evidence was produced . . . that fraud, collusion or arbitrariness existed in any of the actions or decisions preliminary to or during the final proceedings of the decision to defrock Bishop Dionisije made by the highest Hierarchical bodies of the Mother Church," Pet. for Cert., App. 44; that the property held by respondent corporations is held in trust for all members of the American-Canadian Diocese; that it was "improper and beyond the power of the Mother Church to take its action in dividing the whole American Diocese into three new Dioceses, changing its boundaries, and in appointing new bishops for

---

[4] The Appellate Court initially held that the suspension, removal, and defrockment of Dionisije were valid and binding upon the civil courts but on rehearing directed that Dionisije should be afforded the opportunity at trial to prove that these were the result of fraud, collusion, or arbitrariness.

said so-called new Dioceses," *id.,* at 46; and that "Firmilian was validly appointed by the Holy Episcopal Synod as temporary Administrator of the whole American Diocese in place of the defrocked Bishop Dionisije," *ibid.*

On appeal, the Supreme Court of Illinois affirmed in part and reversed in part, essentially holding that Dionisije's removal and defrockment had to be set aside as "arbitrary" because the proceedings resulting in those actions were not conducted according to the Illinois Supreme Court's interpretation of the Church's constitution and penal code, and that the Diocesan reorganization was invalid because it was beyond the scope of the Mother Church's authority to effectuate such changes without Diocesan approval. 60 Ill. 2d 477, 328 N. E. 2d 268 (1975). Although the court denied rehearing, it amended its original opinion to hold that, although Dionisije had been properly suspended, that suspension terminated by operation of church law when he was not validly tried within one year of his indictment. Thus, the court purported in effect to reinstate Dionisije as Diocesan Bishop.

## II

The fallacy fatal to the judgment of the Illinois Supreme Court is that it rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity and resolutions based thereon of those disputes. Consistently with the First and Fourteenth Amendments "civil courts do not inquire whether the relevant [hierarchical] church governing body has power under religious law [to decide such disputes]. . . . Such a determination . . . frequently necessitates the interpretation of ambiguous religious law and usage.

To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide . . . religious law [governing church polity] . . . would violate the First Amendment in much the same manner as civil determination of religious doctrine." *Md. & Va. Churches* v. *Sharpsburg Church*, 396 U. S. 367, 369 (1970) (BRENNAN, J., concurring). For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them. *Ibid.*

Resolution of the religious disputes at issue here affects the control of church property in addition to the structure and administration of the American-Canadian Diocese. This is because the Diocesan Bishop controls respondent Monastery of St. Sava and is the principal officer of respondent property-holding corporations. Resolution of the religious dispute over Dionisije's defrockment therefore determines control of the property. Thus, this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals. Even when rival church factions seek resolution of a church property dispute in the civil courts there is substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Because of this danger, "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian Church* v. *Hull Church*, 393 U. S. 440, 449 (1969). "First Amend-

ment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. . . . [T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Ibid.* This principle applies with equal force to church disputes over church polity and church administration.

The principles limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights were initially fashioned in *Watson* v. *Jones,* 13 Wall. 679 (1872), a diversity case decided before the First Amendment had been rendered applicable to the States through the Fourteenth Amendment.[5] With respect to hierarchical churches, *Watson* held:

"[T]he rule of action which should govern the civil courts . . . is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.,* at 727.

In language having "a clear constitutional ring," *Presbyterian Church* v. *Hull Church, supra,* at 446, *Watson* reasoned:

"The law knows no heresy, and is committed to the

_____

[5] Since *Watson* predated *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), it was based on general federal law rather than the state law of the forum in which it was brought.

support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. *It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.*" 13 Wall., at 728–729 (emphasis supplied).

*Gonzalez* v. *Archbishop,* 280 U. S. 1 (1929), applied this principle in a case involving dispute over entitlement to certain income under a will that turned upon an ecclesiastical determination as to whether an individual would be appointed to a chaplaincy in the Roman Catholic Church. The Court, speaking through Mr. Justice Brandeis, observed:

"Because the appointment [to the chaplaincy] is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church

"tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Id.,* at 16.

Thus, although *Watson* had left civil courts no role to play in reviewing ecclesiastical decisions during the course of resolving church property disputes, *Gonzalez* first adverted to the possibility of "marginal civil court review," *Presbyterian Church* v. *Hull Church, supra,* at 447, in cases challenging decisions of ecclesiastical tribunals as products of "fraud, collusion, or arbitrariness." However, since there was "not even a suggestion that [the Archbishop] exercised his authority [in making the chaplaincy decision] arbitrarily," 280 U. S., at 18, the suggested "fraud, collusion, or arbitrariness" exception to the *Watson* rule was dictum only. And although references to the suggested exception appear in opinions in cases decided since the *Watson* rule has been held to be mandated by the First Amendment,[6] no decision of this Court has given concrete content to or applied the "exception." However, it was the predicate for the Illinois Supreme Court's decision in this case, and we therefore turn to the question whether reliance upon it in the circumstances of this case was consistent with the prohibition of the First and Fourteenth Amendments against rejection of the decisions of the Mother Church upon the religious disputes in issue.

The conclusion of the Illinois Supreme Court that the decisions of the Mother Church were "arbitrary" was grounded upon an inquiry that persuaded the Illinois Su-

---

[6] See *Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94, 115–116, and n. 23 (1952); *Presbyterian Church* v. *Hull Church,* 393 U. S. 440, 447, 450–451, and n. 7 (1969); *Md. & Va. Churches* v. *Sharpsburg Church,* 396 U. S. 367, 369 n. 3 (1970) (BRENNAN, J., concurring).

preme Court that the Mother Church had not followed its own laws and procedures in arriving at those decisions. We have concluded that whether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes,[7] no "arbitrariness" exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them. *Watson* itself requires our conclusion in its rejection of the analogous argument that ecclesiastical decisions of the highest church judicatories need only be accepted if the subject matter of the dispute is within their "jurisdiction."

"But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,—a matter over which the civil courts

---

[7] No issue of "fraud" or "collusion" is involved in this case.

exercise no jurisdiction,—*a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,*—becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction. But it is easy to see that *if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws,* would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, *and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.*" 13 Wall., at 733–734. (Emphasis supplied.)

Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith [8] whether or not rational or measurable by

---

[8] Civil judges obviously do not have the competence of ecclesiastical tribunals in applying the "law" that governs ecclesiastical disputes, as *Watson* cogently remarked, 13 Wall., at 729:

"Nor do we see that justice would be likely to be promoted by

objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness"
or impermissible objectives, are therefore hardly relevant
to such matters of ecclesiastical cognizance.

The constitutional evils that attend upon any "arbitrariness" exception in the sense applied by the Illinois
Supreme Court to justify civil court review of ecclesiastical decisions of final church tribunals are manifest in
the instant case. The Supreme Court of Illinois recognized that all parties agree that the Serbian Orthodox
Church is a hierarchical church, and that the sole power
to appoint and remove Bishops of the Church resides
in its highest ranking organs, the Holy Assembly and the
Holy Synod.[9] Indeed, final authority with respect to the

submitting those decisions to review in the ordinary judicial tribunals.
Each of these large and influential bodies (to mention no others, let
reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional
and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest
minds to become familiar with. It is not to be supposed that the
judges of the civil courts can be as competent in the ecclesiastical
law and religious faith of all these bodies as the ablest men in each
are in reference to their own. It would therefore be an appeal from
the more learned tribunal in the law which should decide the case,
to one which is less so."

[9] "Plaintiffs argue and defendant Bishop Dionisije does not dispute that the Serbian Orthodox Church is a hierarchical and episcopal church. Moreover, the parties agree that in cases involving
hierarchical churches the decisions of the proper church tribunals
on questions of discipline, faith or ecclesiastical rule, though affecting civil rights, are accepted as conclusive in disputes before
the civil courts. . . . All parties maintain that the sole limitation
on this rule, when civil courts may entertain the 'narrowest kind of
review,' occurs when the decision of the church tribunal is claimed

promulgation and interpretation of *all* matters of church discipline and internal organization rests with the Holy Assembly, and even the written constitution of the Mother Church expressly provides:

> "The Holy Assembly of Bishops, as the highest hierarchical body, is legislative authority in the matters of faith, officiation, church order (discipline) and internal organization of the Church, as well as the highest church juridical authority within its jurisdiction (Article 69 sec. 28)." Art. 57.
>
> "All the decisions of the Holy Assembly of Bish-

---

to have resulted from fraud, collusion or arbitrariness." 60 Ill. 2d 477, 501, 328 N. E. 2d 268, 280 (1975).

Respondents conceded as much at oral argument. Tr. of Oral Arg. 24–25, 39–40. The hierarchical nature of the relationship between the American-Canadian Diocese and the Mother Church is confirmed by the fact that respondent corporations were organized under the provisions of the Illinois Religious Corporations Act governing the incorporation of religious societies that are subordinate parts of larger church organizations. Similarly, the Diocese's subordinate nature was manifested in resolutions of the Diocese which Dionisije supported, and by Dionisije's submission of corporate bylaws, proposed constitutional changes, and final judgments of the Diocesan Ecclesiastical Court to the Holy Synod or Holy Assembly for approval. Moreover, when Dionisije was originally elevated to Bishop, he signed an Episcopal-Hierarchical Oath by which he swore that he would "always be obedient to the Most Holy Assembly" and:

"Should I transgress against whatever I promised here, or should I be disobedient to the Divine Ordinances and Order of the Eastern Orthodox Church, or to the Most Holy Assembly (of Bishops) I, personally, will become a schismatic and should I make the Diocese entrusted to me in any manner to become disobedient to the Most Holy Assembly (of Bishops), may I, in that case, be defrocked of my rank and divested of the (episcopal) authority without any excuse or gainsay, and (may I) become an alien to the heavenly gift which is being given unto me by the Holy Spirit through the Consecration of the Laying of Hands." App. 1088.

Finally, the hierarchical relationship was confirmed by provisions in the constitutions of both the Diocese and the Mother Church.

ops and of the Holy Synod of Bishops of canonical and church nature, in regard to faith, officiation, church order and internal organization of the church, are valid and final." Art. 64.

"The Holy Assembly of Bishops, whose purpose is noted in Article 57 of this Constitution:

.           .           .           .           .

"9) interprets canonical-ecclesiastical rules, those which are general and obligatory, and particular ones, and publishes their collections;

.           .           .           .           .

"12) prescribes the ecclesiastical-judicial procedure for all Ecclesiastical Courts;

.           .           .           .           .

"26) settles disputes of jurisdiction between hierarchical and church-self governing organs;

"27) ADJUDGES:

"A) In first and in final instances:

"a) disagreements between bishops and the Holy Synod, and between the bishops and the Patriarch;

"b) canonical offenses of the Patriarch;

"B) In the second and final instance:

"All matters which the Holy Synod of Bishops judged in the first instance." Art. 69.

Nor is there any dispute that questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern; the bishop of a church is clearly one of the central figures in such a hierarchy and the embodiment of the church within his Diocese, and the Mother Church constitution states that "[h]e is, according to the church canonical regulations, chief representative and guiding leader of all church spiritual life and church order in the diocese." Art. 13.

Yet having recognized that the Serbian Orthodox Church is hierarchical and that the decisions to suspend and

defrock respondent Dionisije were made by the religious bodies in whose sole discretion the authority to make those ecclesiastical decisions was vested, the Supreme Court of Illinois nevertheless invalidated the decision to defrock Dionisije on the ground that it was "arbitrary" because a "detailed review of the evidence discloses that the proceedings resulting in Bishop Dionisije's removal and defrockment were not in accordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church." 60 Ill. 2d, at 503, 328 N. E. 2d, at 281. Not only was this "detailed review" impermissible under the First and Fourteenth Amendments, but in reaching this conclusion, the court evaluated conflicting testimony concerning internal church procedures and rejected the interpretations of relevant procedural provisions by the Mother Church's highest tribunals. Id., at 492–500, 328 N. E. 2d, at 276–280. The court also failed to take cognizance of the fact that the church judicatories were also guided by other sources of law, such as canon law, which are admittedly not always consistent, and it rejected the testimony of petitioners' five expert witnesses [10] that church procedures were properly followed, denigrating the testimony of one witness as "contradictory" and discounting that of another on the ground that it was "premised upon an assumption which did not consider the penal code," even though there was some question whether that code even applied to discipline of Bishops.[11] The court

---

[10] Three of these witnesses, including the author of the Church penal code, were members of the Holy Assembly of Bishops, one was the Secretary of the Holy Synod, and one was a recognized expert in the field of ecclesiastical law.

[11] Indeed Dionisije, who does not dispute the power of the Holy Assembly to discipline him for the substantive charges in his indictment, nevertheless inconsistently insists that the Holy Assembly must be bound by procedures which were not extant when he exe-

accepted, on the other hand, the testimony of respondents' sole expert witness that the Church's procedures had been contravened in various specifics. We need not, and under the First Amendment cannot, demonstrate the propriety or impropriety of each of Dionisije's procedural claims, but we can note that the state court even rejected petitioners' contention that Dionisije's failure to participate in the proceedings undermined all procedural contentions because Arts. 66 and 70 of the penal code specify that if a person charged with a violation fails to participate or answer the indictment, the allegations are admitted and due process will be concluded without his participation; the court merely asserted that "application of this provision . . . must be viewed from the perspective that Bishop Dionisije refused to participate because he maintained that the proceedings against him were in violation of the constitution and the penal code of the Serbian Orthodox Church." 60 Ill. 2d, at 502, 328 N. E. 2d, at 281. The court found no support in any church dogma for this judicial rewriting of church law, and compounded further the error of this intrusion into a religious thicket by declaring that although Dionisije had, even under the court's analysis, been properly suspended and replaced by Firmilian as temporary administrator, he had to be reinstated as Bishop because church law mandated a trial on ecclesiastical charges within one year of the indictment. Yet the only reason more time than that had expired was due to Dionisije's decision to resort to the civil courts for redress without attempting to vindicate himself by pursuing available

cuted his Episcopal-Hierarchical Oath, see n. 9, *supra,* and which were promulgated within a year of the beginning of this controversy, although at the same time he agrees that the Holy Assembly could formalize and promulgate any procedures it desired for the conduct of disciplinary action.

remedies within the church. Indeed, the Illinois Supreme Court overlooked the clear substantive canonical violations for which the Church disciplined Dionisije, violations based on Dionisije's conceded open defiance and rebellion against the church hierarchy immediately after the Holy Assembly's decision to suspend him (a decision which even the Illinois courts deemed to be proper) and Dionisije's decision to litigate the Mother Church's authority in the civil courts rather than participate in the disciplinary proceedings before the Holy Synod and the Holy Assembly. Instead, the Illinois Supreme Court would sanction this circumvention of the tribunals set up to resolve internal church disputes and has ordered the Mother Church to reinstate as Bishop one who espoused views regarded by the church hierarchy to be schismatic and which the proper church tribunals have already determined merit severe sanctions. In short, under the guise of "minimal" review under the umbrella of "arbitrariness," the Illinois Supreme Court has unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church. And although the Diocesan Bishop controls respondent Monastery of St. Sava and is the principal officer of respondent property-holding corporations, the civil courts must accept that consequence as the incidental effect of an ecclesiastical determination that is not subject to judicial abrogation, having been reached by the final church judicatory in which authority to make the decision resides.

## III

Similar considerations inform our resolution of the second question we must address—the constitutionality of the Supreme Court of Illinois' holding that the Mother Church's reorganization of the American-Canadian Dio-

cese into three Dioceses was invalid because it was " 'in clear and palpable excess of its own jurisdiction.' " Essentially, the court premised this determination on its view that the early history of the Diocese "manifested a clear intention to retain independence and autonomy in its administrative affairs while at the same time becoming ecclesiastically and judicially an organic part of the Serbian Orthodox Church," and its interpretation of the constitution of the American-Canadian Diocese as confirming this intention. It also interpreted the constitution of the Serbian Orthodox Church, which was adopted after the Diocesan constitution, in a manner consistent with this conclusion. 60 Ill. 2d, at 506–507, 328 N. E. 2d, at 283–284.

This conclusion was not, however, explicitly based on the "fraud, collusion, or arbitrariness" exception. Rather, the Illinois Supreme Court relied on purported "neutral principles" for resolving property disputes which would "not in any way entangle this court in the determination of theological or doctrinal matters." *Id.*, at 505, 328 N. E. 2d, at 282. Nevertheless the Supreme Court of Illinois substituted its interpretation of the Diocesan and Mother Church constitutions for that of the highest ecclesiastical tribunals in which church law vests authority to make that interpretation. This the First and Fourteenth Amendments forbid.

We will not delve into the various church constitutional provisions relevant to this conclusion, for that would repeat the error of the Illinois Supreme Court. It suffices to note that the reorganization of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs; Arts. 57 and 64 of the Mother Church constitution commit such questions of church polity to the final province of the Holy Assembly. *Kedroff* v. *St. Nicholas Cathedral*, 344 U. S. 94, 116 (1952), stated that religious freedom encompasses the

"power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." The subordination of the Diocese to the Mother Church in such matters, which are not only "administrative" but also "hierarchical," [12] was provided, and the power of the Holy Assembly to reorganize the Diocese is expressed in the Mother Church constitution.[13] Contrary to the interpretation of the Illinois court, the church judicatories interpreted the provisions of the Diocesan constitution not to interdict or govern this action, but only to relate to the day-to-day administration of Diocesan property.[14]

---

[12] See Art. 12, quoted *supra*, at 699. Various provisions of the Diocesan constitution reaffirm the subordinate status of the Diocese. *E. g.*, Arts. 1, 2, 10, 12, 23, 53. Moreover, the Mother Church exerts almost complete authority over most Diocesan matters through the Diocesan Bishop, and there is no question that the Diocese has no voice whatever in the appointment of the Bishop.

[13] See Art. 16, quoted *supra*, at 699–700. In rejecting the Holy Assembly's interpretation of this provision, the Illinois court treated the creation and reorganization of dioceses as purely administrative, without recognizing the central role of a diocese in the hierarchical structure of the Church. In particular, the Illinois court noted that Art. 14 of the Mother Church constitution states "[t]hese are the Dioceses in the Serbian Orthodox Church," and lists only the Dioceses within Yugoslavia. In Art. 15, on the other hand, were listed Dioceses "under the jurisdiction of the Serbian Orthodox Church in spiritual and hierarchical aspect," including the American-Canadian Diocese. Although nothing in the constitution restricted the Mother Church's power with respect to reorganizing the Dioceses listed in Art. 15, the Illinois courts simply asserted that Art. 16 was only intended to apply to Dioceses named in Art. 14. Yet even the Diocese itself recognized the Holy Assembly's powers when it sought approval for institution of the "Metropolia" system.

[14] The Illinois court, in refusing to follow the Holy Assembly's interpretation of these religious documents, relied primarily on Art. 3 of the Diocesan constitution, quoted *supra*, at 701. However, the Holy Assembly's construction of that provision limits its application

The constitutional provisions of the American-Canadian Diocese were not so express that the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity. See *Md. & Va. Churches* v. *Sharpsburg Church,* 396 U. S., at 368–370 (BRENNAN, J., concurring). [15]

The control of Diocesan property may be little affected by the changes; respondents' allegation that the reorganization was a fraudulent subterfuge to divert Diocesan property from its intended beneficiaries has been rejected by the Illinois courts. Formal title to the property remains in respondent property-holding corporations, to be held in trust for all members of the new Dioceses. The boundaries of the reorganized Dioceses generally conform to the episcopal districts which the American-Canadian Diocese had already employed for its internal government, and the appointed administrators of the new Dioceses were the same individuals nominated by Dionisije as assistant bishops to govern similar divisions under him. Indeed, even the Illinois courts' rationale that the reorganization would effectuate an abrogation of the Diocesan constitution has no support in the record, which establishes rather that the details of the reorganization and any decisions pertaining to a distribution of

---

to administration of property within the Diocese, and as not restricting alterations in the Diocese itself.

[15] No claim is made that the "formal title" doctrine by which church property disputes may be decided in civil courts is to be applied in this case. See *Md. & Va. Churches* v. *Sharpsburg Church,* 396 U. S., at 370 (BRENNAN, J., concurring). Indeed, the Mother Church decisions defrocking Dionisije and reorganizing the Diocese in no way change formal title to all Diocesan property, which continues to be in the respondent property-holding corporations in trust for all members of the reorganized Dioceses; only the identity of the trustees is altered by the Mother Church's ecclesiastical determinations.

the property among the three Dioceses were expressly left for the Diocesan National Assembly to determine. In response to inquiries from the Diocese, the Holy Assembly assured Bishop Firmilian:

"1. That all the rights of the former American-Canadian Diocese, as they relate to the autonomy in the administrative sense, remain unchanged. The only exception is the forming of three dioceses and

"2. That the Constitution of the former American-Canadian Diocese remains the same and that the Dioceses in America and Canada will not, in an administrative sense (the management (*or direction*) of the properties) be managed (*or directed*) in the same manner as those in Yugoslavia." App. 1446.

As a practical matter the effect of the reorganization is a tripling of the Diocesan representational strength in the Holy Assembly and a decentralization of hierarchical authority to permit closer attention to the needs of individual congregations within each of the new Dioceses, a result which Dionisije and Diocesan representatives had already concluded was necessary. Whether corporate bylaws or other documents governing the individual property-holding corporations may affect any desired disposition of the Diocesan property is a question not before us.

## IV

In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over

the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.

*Reversed.*

THE CHIEF JUSTICE concurs in the judgment.

MR. JUSTICE WHITE, concurring.

Major predicates for the Court's opinion are that the Serbian Orthodox Church is a hierarchical church and the American-Canadian Diocese, involved here, is part of that Church. These basic issues are for the courts' ultimate decision, and the fact that church authorities may render their opinions on them does not foreclose the courts from coming to their independent judgment. I do not understand the Court's opinion to suggest otherwise and join the views expressed therein.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEVENS joins, dissenting.

The Court's opinion, while long on the ecclesiastical history · of the Serbian Orthodox Church, is somewhat short on the procedural history of this case. A casual reader of some of the passages in the Court's opinion could easily gain the impression that the State of Illinois had commenced a proceeding designed to brand Bishop Dionisije as a heretic, with appropriate pains and penalties. But the state trial judge in the Circuit Court of Lake County was not the Bishop of Beauvais, trying Joan of Arc for heresy; the jurisdiction of his court was invoked by petitioners themselves, who sought an injunction establishing their control over property of the American-Canadian Diocese of the church located in Lake County.

The jurisdiction of that court having been invoked

for such a purpose by both petitioners and respondents, contesting claimants to Diocesan authority, it was entitled to ask if the real Bishop of the American-Canadian Diocese would please stand up. The protracted proceedings in the Illinois courts were devoted to the ascertainment of who that individual was, a question which the Illinois courts sought to answer by application of the canon law of the church, just as they would have attempted to decide a similar dispute among the members of any other voluntary association. The Illinois courts did not in the remotest sense inject their doctrinal preference into the dispute. They were forced to decide between two competing sets of claimants to church office in order that they might resolve a dispute over real property located within the State. Each of the claimants had requested them to decide the issue. Unless the First Amendment requires control of disputed church property to be awarded solely on the basis of ecclesiastical paper title, I can find no constitutional infirmity in the judgment of the Supreme Court of Illinois.

Unless civil courts are to be wholly divested of authority to resolve conflicting claims to real property owned by a hierarchical church, and such claims are to be resolved by brute force, civil courts must of necessity make some factual inquiry even under the rules the Court purports to apply in this case. We are told that "a civil court must accept the ecclesiastical decisions of church tribunals as it finds them," *ante,* at 713. But even this rule requires that proof be made as to what these decisions are, and if proofs on that issue conflict the civil court will inevitably have to choose one over the other. In so choosing, if the choice is to be a rational one, reasons must be adduced as to why one proffered decision is to prevail over another. Such reasons will

obviously be based on the canon law by which the disputants have agreed to bind themselves, but they must also represent a preference for one view of that law over another.

If civil courts, consistently with the First Amendment, may do that much, the question arises why they may not do what the Illinois courts did here regarding the defrockment of Bishop Dionisije, and conclude, on the basis of testimony from experts on the canon law at issue, that the decision of the religious tribunal involved was rendered in violation of its own stated rules of procedure. Suppose the Holy Assembly in this case had a membership of 100; its rules provided that a bishop could be defrocked by a majority vote of any session at which a quorum was present, and also provided that a quorum was not to be less than 40. Would a decision of the Holy Assembly attended by 30 members, 16 of whom voted to defrock Bishop Dionisije, be binding on civil courts in a dispute such as this? The hypothetical example is a clearer case than the one involved here, but the principle is the same. If the civil courts are to be bound by any sheet of parchment bearing the ecclesiastical seal and purporting to be a decree of a church court, they can easily be converted into handmaidens of arbitrary lawlessness.

The cases upon which the Court relies are not a uniform line of authorities leading inexorably to reversal of the Illinois judgment. On the contrary, they embody two distinct doctrines which have quite separate origins. The first is a common-law doctrine regarding the appropriate roles for civil courts called upon to adjudicate church property disputes—a doctrine which found general application in federal courts prior to *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), but which has never had any application to our review of a state-court

decision. The other is derived from the First Amendment to the Federal Constitution, and is of course applicable to this case; it, however, lends no more support to the Court's decision than does the common-law doctrine.

The first decision of this Court regarding the role of civil courts in adjudicating church property disputes was *Watson* v. *Jones,* 13 Wall. 679 (1872). There the Court canvassed the American authorities and concluded that where people had chosen to organize themselves into voluntary religious associations, and had agreed to be bound by the decisions of the hierarchy created to govern such associations, the civil courts could not be availed of to hear appeals from otherwise final decisions of such hierarchical authorities. The bases from which this principle was derived clearly had no constitutional dimension; there was not the slightest suggestion that the First Amendment or any other provision of the Constitution was relevant to the decision in that case. Instead the Court was merely recognizing and applying general rules as to the limited role which civil courts must have in settling private intraorganizational disputes. While those rules, and the reasons behind them, may seem especially relevant to intrachurch disputes, adherence or nonadherence to such principles was certainly not thought to present any First Amendment issues. For as the Court in *Watson* observed:

> "Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints." *Id.,* at 714.

The Court's equation of religious bodies with other private voluntary associations makes it clear that the prin-

ciples discussed in that case were not dependent upon those embodied in the First Amendment.

Less than a year later *Watson's* observations about the roles of civil courts were followed in *Bouldin* v. *Alexander,* 15 Wall. 131 (1872), where the Court held that the appointed trustees of the property of a congregational church

> "cannot be removed from their trusteeship by a minority of the church society or meeting, without warning, and acting without charges, without citation or trial, and in direct contravention of the church rules." *Id.,* at 140.

Again, there was nothing to suggest that this was based upon anything but commonsense rules for deciding an intraorganizational dispute: in an organization which has provided for majority rule through certain procedures, a minority's attempt to usurp that rule and those procedures need be given no effect by civil courts.

In *Gonzalez* v. *Archbishop,* 280 U. S. 1 (1929), the Court again recognized the principles underlying *Watson* in upholding a decision of the Supreme Court of the Philippine Islands that the petitioner was not entitled to the chaplaincy which he claimed because the decision as to whether he possessed the necessary qualifications for that post was one committed to the appropriate church authorities. In dicta which the Court today conveniently truncates, Mr. Justice Brandeis observed:

> "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, *because the parties in interest made them so by contract or otherwise. Under like circumstances, effect is given in the courts to the determinations of the judicatory bodies estab-*

*lished by clubs and civil associations."* *Id.*, at 16–17 (emphasis supplied; footnotes omitted).

*Gonzalez* clearly has no more relevance to the meaning of the First Amendment than do its two predecessors.

The year 1952 was the first occasion on which this Court examined what limits the First and Fourteenth Amendments might place upon the ability of the States to entertain and resolve disputes over church property. In *Kedroff* v. *St. Nicholas Cathedral*, 344 U. S. 94 (1952), the Court reversed a decision of the New York Court of Appeals which had upheld a statute awarding control of the New York property of the Russian Orthodox Church to an American group seeking to terminate its relationships with the hierarchical Mother Church in Russia. The New York Legislature had concluded that the Communist government of Russia was actually in control of the Mother Church and that " 'the Moscow Patriarchate was no longer capable of functioning as a true religious body, but had become a tool of the Soviet Government primarily designed to implement its foreign policy,' " *id.*, at 107 n. 10, quoting from 302 N. Y. 1, 32–33, 96 N. E. 2d 56, 73–74 (1950), and the New York Court of Appeals sustained the statute against the constitutional attack. This Court, however, held the statute was a violation of the Free Exercise Clause, noting:

> "By fiat it displaces one church administrator with another. It passes the control of matters strictly ecclesiastical from one church authority to another. It thus intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." 344 U. S., at 119.

On remand from the decision in *Kedroff,* the New York Court of Appeals again held that the American

group was entitled to the church property at issue. This time relying upon the common law of the State, the Court of Appeals ruled that the Patriarch of Moscow was so dominated by the secular government of Russia that his appointee could not validly occupy the Church's property. On appeal, this Court reversed summarily, *Kreshik* v. *St. Nicholas Cathedral,* 363 U. S. 190 (1960), noting in its *per curiam* opinion that

> "the decision now under review rests on the same premises which were found to have underlain the enactment of the statute struck down in *Kedroff.*" *Id.,* at 191.

Nine years later, in *Presbyterian Church* v. *Hull Church,* 393 U. S. 440 (1969), the Court held that Georgia's common law, which implied a trust upon local church property for the benefit of the general church only on the condition that the general church adhere to its tenets of faith and practice existing at the time of affiliation by the local churches, was inconsistent with the First and Fourteenth Amendments and therefore could not be utilized to resolve church property disputes. The Georgia law was held impermissible because

> "[u]nder [the Georgia] approach, property rights do not turn on a church decision as to church doctrine. The standard of departure-from-doctrine, though it calls for resolution of ecclesiastical questions, is a creation of state, not church, law." *Id.,* at 451.

Finally, in *Md. & Va. Churches* v. *Sharpsburg Church,* 396 U. S. 367 (1970), the Court considered an appeal from a judgment of the Court of Appeals of Maryland upholding the dismissal of two actions brought by the Eldership seeking to prevent two of its local churches from withdrawing from that general religious association. The Eldership had also claimed the rights to select the

clergy and to control the property of the two local churches, but the Maryland courts, relying "upon provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the local church corporations, upon the terms of the charters of the corporations, *and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property,*" *ibid.* (emphasis supplied; footnote omitted), concluded that the Eldership had no right to invoke the State's authority to compel their local churches to remain within the fold or to succeed to control of their property. This Court dismissed the Eldership's contention that this judgment violated the First Amendment for want of a substantial federal question.

Despite the Court's failure to do so, it does not seem very difficult to derive the operative constitutional principle from this line of decisions. As should be clear from even this cursory study, *Watson, Bouldin,* and *Gonzalez* have no direct relevance* to the question before us today:

---

*I am far from persuaded, moreover, that these decisions would require the result reached today even if we were reviewing a federal decision rather than that of a state court. As demonstrated in the text, *supra,* these cases were applications of the general principle that persons who have contractually bound themselves to adhere to the decisions of the ruling hierarchy in a private association may not obtain relief from those decisions in a civil court. Here the underlying question addressed by the Illinois courts is the one assumed in *Watson et al.:* whether the members of the American-Canadian Diocese *had* bound themselves to abide by the decisions of the Mother Church in the matters at issue here. The Illinois courts concluded that in regard to some of these matters they had agreed to be bound only if certain procedures were followed and that as to others there had been no agreement to submit to the authority of the Belgrade Patriarchate at all. If these conclusions are correct, and there is little to indicate they

whether the First Amendment, as made applicable to the States by the Fourteenth, prohibits Illinois from permitting its civil courts to settle religious property disputes in the manner presented to us on this record. I think it equally clear that the only cases which *are* relevant to that question—*Kedroff, Kreshik, Hull,* and *Md. & Va. Churches*—require that this question be answered in the negative. The rule of those cases, one which seems fairly implicit in the history of our First Amendment, is that the government may not displace the free religious choices of its citizens by placing its weight behind a particular religious belief, tenet, or sect. That is what New York attempted to do in *Kedroff* and *Kreshik,* albeit perhaps for nonreligious reasons, and the Court refused to permit it. In *Hull,* the State transgressed the line drawn by the First Amendment when it applied a state-created rule of law based upon "departure from doctrine" to prevent the national hierarchy of the Presbyterian Church in the United States from seeking to reclaim possession and use of two local churches. When the Georgia courts themselves required an examination into whether there had been a departure from the doctrine of the church in order to apply this state-created rule, they went beyond mere application of neutral principles of law to such a dispute.

There is nothing in this record to indicate that the Illinois courts have been instruments of any such impermissible intrusion by the State on one side or the other of a religious dispute. There is nothing in the Supreme Court of Illinois' opinion indicating that it placed its thumb on the scale in favor of the respondents. Instead that opinion appears to be precisely what it pur-

---

are not, then the *"Watson* rule" which the Court brandishes so freely today properly would have no application to these facts even if this case had arisen in federal court.

.

.

ports to be: an application of neutral principles of law consistent with the decisions of this Court. Indeed, petitioners make absolutely no claim to the contrary. They agree that the Illinois courts *should* have decided the issues which *they* presented; but they contend that in doing so those courts should have deferred entirely to the representations of the announced representatives of the Mother Church. Such blind deference, however, is counseled neither by logic nor by the First Amendment. To make available the coercive powers of civil courts to rubber-stamp ecclesiastical decisions of hierarchical religious associations, when such deference is not accorded similar acts of secular voluntary associations, would, in avoiding the free exercise problems petitioners envision, itself create far more serious problems under the Establishment Clause.

In any event the Court's decision in *Md. & Va. Churches* demonstrates that petitioners' position in this regard is untenable. And as I read that decision, it seems to me to compel affirmance of at least that portion of the Illinois court's decision which denied petitioners' request for the aid of the civil courts in enforcing its desire to divide the American-Canadian Diocese. See *ante,* at 720–724 (Part III). I see no distinction between the Illinois courts' refusal to place their weight behind the representatives of the Serbian Mother Church who sought to prevent portions of their American congregation from splitting off from that body and the Maryland courts' refusal to do the same thing for the Eldership of the Church of God. The Court today expressly eschews any explanation for its failure to follow *Md. & Va. Churches,* see *ante,* at 721, contenting itself with this conclusory statement:

> "The constitutional provisions of the American-Canadian Diocese were not so express that the civil

courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity." *Ante,* at 723.

But comparison of the relevant discussions by the state tribunals regarding their consideration of church documents makes this claimed distinction seem quite specious. Compare *Md. & Va. Churches* v. *Sharpsburg Church,* 254 Md. 162, 170, 254 A. 2d 162, 168 (1969), with *Serbian Orthodox Diocese* v. *Ocokoljich,* 72 Ill. App. 2d 444, 458–462, 219 N. E. 2d 343, 350–353 (1966).

In conclusion, while there may be a number of good arguments that civil courts of a State should, as a matter of the wisest use of their authority, avoid adjudicating religious disputes to the maximum extent possible, they obviously cannot avoid all such adjudications. And while common-law principles like those discussed in *Watson, Bouldin,* and *Gonzalez* may offer some sound principles for those occasions when such adjudications are required, they are certainly not rules to which state courts are required to adhere by virtue of the Fourteenth Amendment. The principles which that Amendment, through its incorporation of the First, *does* enjoin upon the state courts—that they remain neutral on matters of religious doctrine—have not been transgressed by the Supreme Court of Illinois.