# SUPREME COURT OF THE UNITED STATES

TRUSTEES OF THE NEW LIFE IN CHRIST CHURCH *v.*
CITY OF FREDERICKSBURG, VIRGINIA

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF VIRGINIA

No. 21–164.　Decided January 18, 2022

The motion of Ethics & Religious Liberty Commission of the Southern Baptist Convention, et al. for leave to file a brief as *amici curiae* is granted.  The petition for a writ of certiorari is denied.

JUSTICE GORSUCH, dissenting from the denial of certiorari.

This case began when the New Life in Christ Church in Fredericksburg, Virginia, claimed a tax exemption for a residence occupied by Josh and Anacari Storms.  Hired as "Youth Ministers," the couple was responsible for "provid[ing] leadership over" the church's "ministry" to college students "through godly example, prayer, leadership development, collegiate community engagement, program management and administrative oversight."  App. to Pet. for Cert. 46a, 57a.  The couple's duties included leading Bible study meetings; providing "discipleship" to "each member of the college ministry"; developing and managing a budget for the "[m]inistry activities"; and "[e]xecut[ing] ministry vision and goals."  *Id.*, at 58a.  For their work, the Storms received a yearly salary from the church.  *Id.*, at 59a.

The city of Fredericksburg (City) sought to deny the church's tax exemption.  Years of litigation ensued.  *Id.*, at 6a.  Before us, though, the dispute is a narrow one.  The parties accept that, under state law, a church may claim a "ministerial" residence exempt from taxes.  See Va. Code Ann. §58.1–3606(A)(2) (2017).  They accept that the Storms'

home was the only residence the church sought to claim exempt. App. to Pet. for Cert. 118a. They acknowledge that the home of a "subordinate" minister can qualify for the tax exemption too. *Id.*, at 72a. And they agree that state law does not supply a definition for the term "minister." Instead, whether a person qualifies as a "minister" varies across "different religious denominations or traditions" and "depends on the organizational policies of the organization." *Id.*, at 20a; see also 1977 Va. Op. Atty. Gen., Ann. Rep. 276, 277 (1976–1977).

So how has the City sought to justify denying the tax exemption? Primarily, the City has argued that the church is not entitled to a tax credit because it misunderstands who qualifies as "minister" in its own faith tradition. To develop this argument, the City conducted extensive discovery into church practices and beliefs. In its interrogatories, the City asked questions such as whether church "doctrine and/or polity" permits Anacari Storms "to be ordained" given that she is a woman. App. to Pet. for Cert. 46a, 48a. Ultimately, the City argued that the church is "governed by the Book of Church Order of the Presbyterian Church in America" and that the "Book of Church Order utilizes the term 'minister' in contexts that make it clear that the term refers to a duly ordained person with specific leadership duties." *Id.*, at 70a–71a. The Storms failed this test, the City argued, because they had "not been ordained" and are not listed as a "Lead Pastor, Associate Pastor, or Assistant Pastor" on the congregation's website. *Id.*, at 72a (internal quotation marks omitted).

The church tried to explain that the City misunderstood its traditions and practices. The church responded that, yes, women can and do serve as ministers. *Id.*, at 95a. It acknowledged that "in order to deliver sermons" a minister in its tradition must be ordained but nothing in its rules or the Book of Church Order "prohibits a particular church from hiring ministers to serve as messengers and teachers

of the faith" without ordination. *Id.*, at 94a–95a. Instead, the church explained its understanding that "Section 12 of the Book of Church Order provides each church rather broad authority to govern its own affairs[,] which . . . include[s] the ability to hire ministers to cater to specialized groups, such as youth." *Id.*, at 95a.

It seems that none of these explanations satisfied the City. Rather than drop its suit, it pressed on with its effort to have the church's tax exemption withdrawn. Ultimately, it even persuaded a state trial court to rule in its favor. After the Virginia Supreme Court declined to review that judgment, the church filed a petition for certiorari in this Court. Yet even now, before this Court, the City continues to insist that a church's religious rules are "subject to verification" by government officials. Brief in Opposition 10.

I would grant the petition and summarily reverse. The First Amendment does not permit bureaucrats or judges to "subject" religious beliefs "to verification." About this, the Court has spoken plainly and consistently for many years. In *Serbian Eastern Orthodox Diocese for United States and Canada* v. *Milivojevich*, for example, a state court conducted a "'detailed review'" before determining that a church's decision was "'not in accordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church.'" 426 U. S. 696, 718 (1976). This Court reversed, explaining that such governmental intrusions into ecclesiastical questions are "impermissible." *Id.*, at 718–719. Absent proof of insincerity or fraud, a church's decisions "'on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as *conclusive*.'" *Id.*, at 729 (emphasis added); see also *Gonzalez* v. *Roman Catholic Archbishop of Manila*, 280 U. S. 1, 16 (1929); *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. \_\_\_ (2020) (slip op., at 26).

The Framers of our Constitution were acutely aware how

governments in Europe had sought to control and manipulate religious practices and churches.  They resolved that America would be different.  In this country, we would not subscribe to the "arrogant pretension" that secular officials may serve as "competent Judge[s] of Religious truth."  Memorial and Remonstrance Against Religious Assessments, in Selected Writings of James Madison 21, 24 (R. Ketcham ed. 2006).  Instead, religious persons would enjoy the right "to decide for themselves, free from state interference, matters of . . . faith and doctrine."  *Kedroff* v. *Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U. S. 94, 116 (1952).  This case may be a small one, and one can hope that the error here is so obvious it is unlikely to be repeated anytime soon.  But I would correct it.  Bureaucratic efforts to "subject" religious beliefs to "verification" have no place in a free country.