NO. 07-09-00182-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JULY 12, 2010

MICHAEL RUNNINGWOLF, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

FROM THE COUNTY COURT OF FLOYD COUNTY;

NO. 10,036; HONORABLE PENNY GOLIGHTLY, JUDGE

Before QUINN, C.J., and HANCOCK, J., and BOYD, S.J.[1]

**OPINION**

A Floyd County jury found appellant, Michael Runningwolf, guilty of simulating legal process[2] and assessed punishment at confinement for one year in the Floyd County Jail and a $4,000.00 fine. We affirm.

---

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

[2] See TEX. PENAL CODE ANN. § 32.48 (Vernon 2003).

## Factual and Procedural History

A state court awarded custody of three children to Helen Coleman, paternal grandmother of one of the children and great aunt of another, T.G. T.G.'s paternal grandmother, Venita Glenn, and Glenn's sisters and mother were associated with a church led by Runningwolf and were displeased that Coleman had custody of T.G.

In May 2008, Glenn's sister, Jerlene Ledbetter, "served" a document on Coleman in front of Coleman's house. Coleman dropped the document and left it on the sidewalk. Minutes later, appellant, along with some of Glenn's relatives, drove up to Coleman's house. Appellant got out of the car and placed the document in Coleman's mailbox. Coleman got the document and called the police. The document delivered to her was styled "Non-Statutory Abatement" (the "Abatement") and referred to the custody of T.G. in terms of "ecclesiastical law," "contempt of court," and "default judgment."

Appellant was charged with simulating legal process. The jury found him guilty of this Class A misdemeanor and assessed punishment at one year in the Floyd County Jail and a fine of $4,000.00. He timely appealed his conviction, bringing six issues before this Court: (1) the acceptance of appellant's "plea" was structural error and rendered the subsequent trial a nullity; (2) the evidence was legally insufficient to support his conviction; (3) the evidence was factually insufficient to support his conviction; (4) the trial court erred by overruling his objection that the statute is facially overbroad and, therefore, a violation of his rights to freedom of speech and free exercise of his religion; (5) the trial court erred by overruling his objection that the

2

statute is facially unconstitutionally vague and, therefore, a violation of his rights to freedom of speech and free exercise of his religion; and (6) the trial court erred by overruling his objection that, as applied, the statute violated his rights to freedom of speech and free exercise of his religion.

## Plea to Charges

After the information was read and the trial court asked appellant how he pleaded to the charges, appellant responded "[b]ar to prosecution." The jury charge, to which no objection was made, stated that appellant pleaded not guilty. After the jury was charged, it sent out a note asking what appellant originally said instead of not guilty. To this note, the trial court responded "[b]ar to prosecution," and neither side objected.

Appellant's contention is premised on his position that the trial court accepted his irregular plea. We do not read the record in such a manner. As the jury charge shows, the trial court entered a plea of not guilty on appellant's behalf. [3] And it did so properly.

A plea must be entered in every criminal case, and if no plea is entered, the trial is a nullity. Lumsden v. State, 384 S.W.2d 143, 144 (Tex.Crim.App. 1964). "[I]f the defendant answers that he is not guilty, such plea shall be entered upon the minutes of the Court; if he refuses to answer, the plea of not guilty shall in like manner be entered."

---

[3] To the extent appellant's contentions complain of the trial court's entry of a not guilty plea on his behalf, such error was not preserved. Failure to object to the trial court's entry of a plea is waived if it is not raised in the trial court. TEX. R. APP. P. 33.1(a)(1); Seale v. State, 158 Tex.Crim. 440, 256 S.W.2d 86, 88 (1953) (op. on reh'g); Cantu v. State, 939 S.W.2d 627, 646 (Tex.Crim.App. 1997). Appellant failed to object to the trial court's entry of a not guilty plea and has, therefore, waived such complaint.

3

TEX. CODE CRIM. PROC. ANN. art. 26.12 (Vernon 2009).  Article 27.16(a) imposes a duty on the trial court to enter a not guilty plea "in the absence of action by the defendant." Mendez v. State, 138 S.W.3d 334, 343 (Tex.Crim.App. 2004) (citing TEX. CODE CRIM. PROC. ANN. art. 27.16(a) (Vernon 2006)).

So, the trial court did not err by entering a plea of not guilty on appellant's behalf; it was duty-bound to do so when appellant insisted on declaring "[b]ar to prosecution" when asked to plead to the charges against him.[4]  See Coyle v. State, 775 S.W.2d 843, 846 (Tex.App.—Dallas 1989, no pet.) (holding that the trial court did not err when it entered a not guilty plea pursuant to article 27.16 for the defendant who, when asked to plead to the charges, responded that "she was innocent of violating the contract with the State of Texas, because no contract exists"); Halbert v. State, No. 05-96-01438-CR, 1999 Tex.App. LEXIS 384, at *5 (Tex.App.—Dallas Jan. 22, 1999, no pet.) (mem. op., not designated for publication) (observing that the county court entered a not guilty plea for appellant after he refused to plead guilty or not guilty and, instead, stated, "I enter a plea of I don't understand the nature of the charge").

---

[4] We are not persuaded by appellant's argument that "[b]ar to prosecution," as he used the phrase, is in the nature of a special plea.  See TEX. CODE CRIM. PROC. ANN. art. 27.10 (Vernon 2006).  Article 27.05 defines a defendant's only special plea and does not include a plea like appellant's declaration.  Id. art. 27.05 (Vernon 2006).  Further, "[e]very special plea shall be verified by the affidavit of the defendant."  Id. art. 27.06 (Vernon 2006).  Appellant's declaration is more in the nature of a refusal to plead which invoked the trial court's duty to enter a not guilty plea for appellant.  Id. art. 27.16(a).

The trial court did not accept appellant's statement of "[b]ar to prosecution" as his plea to the charges against him. Instead, the trial court properly entered a plea of not guilty on appellant's behalf. We overrule appellant's first issue.

## Sufficiency of the Evidence

### Standards of Review

In assessing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed. 560 (1979); Laster v. State, 275 S.W.3d 512, 517 (Tex.Crim.App. 2009). In conducting a legal sufficiency review, an appellate court may not sit as a thirteenth juror, but rather must uphold the jury's verdict unless it is irrational or unsupported by more than a mere modicum of evidence. Moreno v. State, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

In a factual sufficiency review, we review all the evidence in a neutral light to determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the trier of fact's verdict is clearly wrong or manifestly unjust. Roberts v. State, 220 S.W.3d 521, 524 (Tex.Crim.App. 2007); Watson v. State, 204 S.W.3d 404, 414–15 (Tex.Crim.App. 2006). In performing a factual sufficiency review, we must give deference to the trier of fact's determinations if supported by evidence and may not order a new trial simply because we may disagree with the verdict. See Watson, 204 S.W.3d at 417. We are not justified in ordering a new trial unless there is some objective basis in the record

5

demonstrating that the great weight and preponderance of the evidence contradicts the jury's verdict. See id. An appellate court's opinion addressing factual sufficiency must include a discussion of the most important evidence that appellant claims undermines the jury's verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

Analysis

A person commits the offense of simulating legal process if he or she "recklessly causes to be delivered to another any document that simulates a summons, complaint, judgment, or other court process with the intent to . . . cause another to submit to the putative authority of the document; or take any action or refrain from taking any action in response to the document, in compliance with the document, or on the basis of the document." TEX. PENAL CODE ANN. § 32.48(a)(2). When we interpret a statute, we look to the literal text for its meaning, and we ordinarily give effect to that plain meaning, unless the plain language is ambiguous or the application of the statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended. State v. Webb, 12 S.W.3d 808, 811 (Tex.Crim.App. 2000). That said, appellant's contention that section 32.48's legislative history indicates its purpose is "to prevent fraudulent action, presumably by such organizations as the so-called 'Republic of Texas'" is not persuasive. Nothing in section 32.48's text limits its application to those involved in specific organizations. We, then, look to the literal text of section 32.48 and apply its plain meaning to the evidence before us.

Appellant relies on Saldana v. State, 109 S.W.3d 4 (Tex.App.—El Paso 2002, no pet.), to support his challenge to the sufficiency of the evidence, characterizing Saldana

as "functionally indistinguishable."  Saldana appears to be the only published case directly addressing the sufficiency of the evidence to support a conviction for simulating legal process.  Saldana had been issued a citation for running a stop sign.  He was later convicted of three counts of simulating legal process stemming from several documents he sent by certified mail to the officer who had issued that traffic citation.  Id. at 5.

After describing the documents, which included references to a "Notice to Appear," the court concluded that the "Notice to Appear," as charged in the indictment, was a reference to the traffic citation itself, did not call upon the officer to appear, and, therefore, did not violate section 32.48.  Id. at 10.  Further, the court did not perceive the documents' "disjointed legalese" as judicial process "having emanated from a court."  Id.  Consequently, it reversed the judgment and rendered a judgment of acquittal.  Id.

The Fort Worth court, in Gibbs v. State, No. 02-04-00563-CR, 2006 Tex.App. LEXIS 1896, at *3 (Tex.App.—Fort Worth Mar. 9, 2006, pet. ref'd) (mem. op., not designated for publication), questioned Saldana's reliance on a North Carolina case interpreting a North Carolina provision and read Saldana as creating an inappropriate distinction, based on North Carolina law, between papers signed by an individual and those purporting to be issued by a court.[5]  Id.  This distinction, according to Gibbs, is not consistent with section 32.48 which, in pertinent part, provides as follows:

---

[5] The North Carolina case held that "documents that use language that possibly indicates judicial process do not constitute such process if the documents are not issued in the name of a court; but rather, an individual."  See State v. Watts, 248 S.E.2d 354, 354–55 (N.C. Ct. App. 1978, rev. denied).

7

(c) It is not a defense to prosecution under this section that the simulating document:

(1) states that it is not legal process; or

(2) purports to have been issued or authorized by a person or entity who did not have lawful authority to issue or authorize the document.

Id. at *3–*4 (quoting TEX. PENAL CODE ANN. § 32.48(c)).

After having expressed its disapproval of the distinction suggested by Saldana, the Gibbs court went on to evaluate the legal sufficiency of the evidence. Id. at *4–*7. Because Gibbs believed that his father was being mistreated at the county jail and that the sheriff was responsible for the mistreatment, Gibbs sent the sheriff two documents, an "Administrative Notice of Failure of Adhering to Policy and Customs Regulations" and a "Notice of Default of Administrative Notice of Failure of Adhering to Policy and Custom Regulations and Bill for Damages." Id. at *2.

The evidence in Gibbs showed that the documents (1) were served on the sheriff by registered mail; (2) used terms common in civil process and litigation, such as "declarant" and "respondent"; (3) cited legislative authority and case law; (4) contained a warning that a default or failure to answer "will stand[] as a judgment nihil dicit"; (5) required the sheriff to respond under penalty of perjury; (6) demanded payment in the amount of $44,000,000; (7) "purported to be a judgment that could be abstracted to collect the money demanded," (8) were signed by Appellant, verified, and notarized; and (9) contained four certificates of service which, the court observed, are commonly used in civil litigation to show that the legal document has been served upon the other parties to the litigation. Id. at *4–*6. The court also noted that the record included a petition

8

filed by Gibbs in an attempt to enforce the declaration of default set forth in the second document. Id. The court held the evidence was sufficient. Id. at *6–*7.

Here, appellant's contentions appear to challenge the sufficiency of the evidence to show that the "Abatement" simulated court process and that he delivered it with the intent to cause Coleman to comply with the document. We disagree.

The "Abatement" consists of ten pages and a wealth of declarations and maxims seemingly designed to undermine the validity of the custody arrangement through state courts and to persuade the named Defendants to recognize the supremacy of the ecclesiastical court sitting in Floydada, Texas, by submitting the custody matter to its authority. On the top of the first page is the large, bold-faced heading "Kingdom of Heaven Ecclesiastic Court." Also on the front page is the "Official Seal" bearing religious symbols and Latin phrases. The document begins with the pronouncement that, "[b]y the Authority and Power delegated to me solely by the Grace of God, . . . I, an ordained Minister of His Gospel, . . . issue this Non-Statutory Abatement." The "Abatement" names Glenn and her relatives, in their respective relation to T.G., as "Demandmants" and names six Defendants.[6] It goes on to "demand[] the compliance of a Court Order issued by" the ecclesiastic court and explains that "a Default and Default Judgment was Lawfully granted and issued in the matter." It outlines eight counts against the Defendants in terms such as "contempt" and "conspiracy."

---

[6] The Defendants are Floyd County Sheriff's Department, Floydada Police Department, Attorney Lex Harrington, Child Protective Services, Coleman, and Monica Wickware.

9

Under its "Declaration of Authority and Jurisdiction," the "Abatement" cites several cases discussing the authority of ecclesiastic courts and outlines the punishment for "conspiracy against rights" under listed circumstances, including kidnapping in bold letters, as a fine or imprisonment "for any term of years or for life, or both, or may be sentenced to death." The "Abatement" was "issued by and under the Ministerial Power and Authority vested solely in and appertaining to the Ministerial Office of Christ . . . and in Lawful execution of His Judgments declared therein by Him against [the named Defendants]."

It repeatedly condemns the Defendants' noncompliance with and contempt of the ecclesiastic court and describes the Defendants' "Marks of Deceit" and "actions of outlawry through color of law:"

> Your actions, or lack thereof, are not sealed with Authority evidencing lineage through His Body . . . traceable to the Tree of Life, and are, therefore, a Trespass against His Dominions and a breach of the Peace of our Lord and Savior Jesus, the Christ, in a vain attempt to circumvent His righteous Judgment upon the world and its darkness.

The "Abatement" characterized the Defendants' actions as "scandalous and libelous."

It then directs the Defendants to "lay and prove in His Lawful ecclesiastic court that you bear the Seal and Testimony of the Most High in the Christ." The ecclesiastic court "so orders the said Defendants to abate their willful and odious actions of non-compliance" and various acts of contempt by showing cause in the ecclesiastic court why the "abatement should not lie." The "Abatement" warns that "failure to obey this Lawful order of and from His Lawful ecclesiastic court or failure to respond in the time prescribed . . . will result in Default and Default Judgment." It then directs that "[a]ll

10

remittance of this instant Cause should be sent" to the ecclesiastic court in Floydada. Though the "Abatement" was not filed, it concludes with the following announcement:

> For the next eight weeks concerning this instant Lawful Cause, to edify in particular all Christians and fellow bondservants sojourning in and with our Lord . . . and for public viewing in general, a Public Notice of this Non-Statutory Abatement and Default Rule Day is posted for Public Record at the Floyd County Courthouse, in Floydada, Texas; and in several other places for all the world to Witness, Record, and have Knowledge.

Deriving guidance from the analysis in Gibbs, we hold that the question of whether a document simulates court process may be answered by reference to the following non-exhaustive list of relevant considerations: (1) the use of terms commonly used in litigation and citation to legal authority, (2) the method of delivery,[7] (3) the presence of a demand or directive, (4) the nature of any demand or directive, (5) the document's internal characterization of its import, and (6) the presence and extent of formalities generally associated with process, such as declarations, cause numbers, seals, or captions. Applying these considerations to the instant case, we see that, much like the documents in Gibbs, the "Abatement" makes extensive use of legal terms, designations, and citation. The "Abatement" includes several references to a default judgment issued by the ecclesiastic court. Although the "Abatement" does not include a cause number, it does make clear that it specifically concerns the legal matter of child

---

[7] We recognize that the method of delivery will ordinarily go to the element of intent. See TEX. PENAL CODE ANN. § 32.48(d) (creating a rebuttable presumption that a person acts with the requisite intent when he or she files the document of record). Nonetheless, the manner in which the document at issue was delivered may also be relevant to whether the document simulates court process. See Gibbs, 2006 Tex. App. LEXIS 1896, at *5 (noting evidence that the documents in question were delivered by registered mail and testimony "that registered mail is commonly used in litigation to show that a party has received a sent document").

custody and attempts to undermine the validity of the secular court's resolution of that legal matter. It also expressly sought a response from Coleman and the other Defendants by demanding that she, along with the other Defendants, answer in the ecclesiastic court. It outlines pending "counts" against the Defendants and suggests the range of punishment to which they may be subject. The use of an "official seal" and the repeated pronouncements of the supremacy of the ecclesiastic court lend further support to the conclusion that the "Abatement" simulates court process. And the declaration that the "Abatement" would be posted at the courthouse and elsewhere also sounds of the formalities associated with court process.

Because it was another party, rather than appellant, who had earlier handed the "Abatement" to Coleman and said that Coleman had been "served," we note that the method of appellant's delivery in the instant case does not lend a great deal to the conclusion that the "Abatement" simulated court process. It does not lend itself to a contrary finding either. And, although some of the phrases used within the "Abatement" could be characterized as "disjointed legalese" in that those trained in the law may recognize that the terms are not used properly, we do not think appellant's misuse of legal terms necessarily establishes that the "Abatement" does not simulate court process. On this point, and to the extent <u>Saldana</u> stands for the proposition that we gauge the precision of usage of legal terms by our own internal standards of usage, we respectfully disagree with our sister court's position.[8] <u>See</u> 109 S.W.3d at 10. Viewing

---

[8] That is, to the extent <u>Saldana</u> stands for the proposition that usage of legal terms must be so precise that we could perceive it as "having emanated from a court," we disagree. <u>See</u> 109 S.W.3d at 10. Of course, a document that uses legal

the evidence in a light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found that the "Abatement" simulated court process.

Appellant maintains that "to sustain a conviction, any putative 'court document' must have at least some threshold plausibility as legal process." To the extent he is addressing the actual authority of the person or "court" issuing the document, we point out that it is not a defense to prosecution that the simulating document "purports to have been issued or authorized by a person or entity who did not have lawful authority to issue or authorize the document." TEX. PENAL CODE ANN. § 32.48(c)(2).

Appellant also directs our attention to Coleman's lack of concern as evidence the "Abatement" was not a "simulating document." Instead, he characterizes the "Abatement" as a statement[9] of the church's disapproval of Coleman's custody of T.G. The recipient's understanding of or reaction to the document does not conclusively

terminology in a clearly ridiculous or jocular fashion would not be a "simulating document." However, we do not think that, to simulate process, a document must be so precise in its usage that those trained in the law would perceive it as having emanated from a court. We should be cautious in our review of the document that we do not engage in a full-fledged review of the merits of the document. Part of our daily activity as an appellate court is to thoroughly assess the viability of assertions made, but we should stop short of such an assessment when we examine the substance of a document to determine whether it sufficiently "simulates" court process.

[9] Appellant also points out that the "Abatement" was not filed. Section 32.48 does not require that the papers at issue be filed and appears to contemplate situations in which documents are not filed. It creates a rebuttable presumption of the requisite intent when, on the other hand, it appears the documents at issue *were* filed. TEX. PENAL CODE ANN. § 32.48(d). A plain reading of the provision permits delivery to a person by other means; to read it as requiring filing would render subsection (d) unnecessary.

13

determine whether the document simulated court process. Cf. Saldana, 109 S.W.3d at 5, 10 (finding the evidence insufficient even when the recipient officer "thought he was being sued" and the IRS sent him an inquiry based on copies it received from appellant). Instead, our review on this element should focus on the document. Based on such review, we conclude that there is also factually sufficient evidence to support the jury's finding that the "Abatement" simulated court process.

As to requisite intent, the "Abatement" itself provides some evidence of intent in that it demanded compliance with the ecclesiastic court's default judgment and repeatedly condemned the conduct of the Defendants. It specifically demanded that the Defendants answer before the ecclesiastic court or show cause why the "Abatement" should not lie. Further, Glenn testified that, after discussing the "Abatement" with appellant, she signed it in the belief that the "Abatement" would help her regain custody of T.G. The investigating officer testified that appellant insisted that federal law and ecclesiastic sovereignty authorized him to issue and enforce the papers. Based on such evidence viewed in a light most favorable to the verdict, the jury could have reasonably found that appellant delivered the "Abatement" with the requisite intent.

To support his position, appellant relies on evidence that Coleman knew the people associated with the document held no legal authority, that she was not at all troubled by the document. However, the recipient's reaction to the papers is not an element of the offense. See Ebert v. State, Nos. 03-06-00752-CR to 03-06-00759-CR, 2007 Tex.App. LEXIS 5952, at *16 (Tex.App.—Austin July 27, 2007, no pet.) (mem. op., not designated for publication) (concluding, in response to arguments that the clerk's

14

office did not immediately file-stamp documents, that "the offenses were complete upon [appellant]'s creation, presentation, and delivery of the documents to the clerk's office without regard to whether or when the clerk filed them"). Nor do we interpret Coleman's reaction relevant to appellant's intent. Section 32.48 makes no mention whether the recipient must take the document seriously or attempt to comply with the document's demands or instructions. Therefore, it is the intent of the actor, not the reaction of the recipient, that we must examine. Having viewed the evidence in a neutral light and considered the evidence on which appellant relies, we conclude that the evidence is also factually sufficient to support the finding that appellant delivered the document with the requisite intent that Coleman submit to the putative authority of the document or that she act or refrain from acting in response to the document's directives.

Having found that legally and factually sufficient evidence supports the conviction, we overrule appellant's second and third issues.

## Constitutional Issues

### Preservation of Error

A defendant must raise an as-applied constitutional challenge in the trial court to preserve it for appellate review. See Curry v. State, 910 S.W.2d 490, 496 (Tex.Crim.App. 1995). The Texas Court of Criminal Appeals has clarified that a facial challenge is subject to the same error-preservation requirement: "a defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute." Karenev v. State, 281 S.W.3d 428, 434 (Tex.Crim.App. 2009).

15

In his *pro se* motion to suppress, filed prior to appointment of counsel, appellant referred to equal protection and due process in the context of recognition of ecclesiastical courts. He urged that "[under] the Ecclesiastical Abstention Doctrine[,] the First Amendment of the U.S. Constitution forbids [the] Court from inquiring into religious doctrine, BELIEFS, or principles." He sought to suppress any evidence "connected to the Ecclesiastical Court." In his *pro se* motion to dismiss, also filed prior to appointment of counsel, appellant challenged the trial court's subject matter jurisdiction on

> the basis that the Prosecutor's Official Oppression of the Defendant are [sic] questions and controversies involving Ecclesiastical [sic], involving doctrine[,] creed[,] and worship, exercise of one's faith[,] and establishing and enforcing needful laws and regulations within the religious association, all legitimate and real, not simulating anything.

He urged that his faith and beliefs are "beyond preview [sic] by this Court."

Defense counsel announced that he reiterated the *pro se* motion to dismiss, without elaborating or explaining the basis of such motion, and added

> that under the Full Faith and Credit Clause of the United States Constitution, through the 14th Amendment of the United States Constitution, which applies to all of the state[s], this is a matter of Ecclesiastical law, which basically, pertains to federal [law]. And federal preempts state law, Your Honor. And it is our position that this Court does not have jurisdiction to hear this matter here today.

He responded to the State's position also in terms of preemption and ecclesiastical law.

Defense counsel's contentions regarding full faith and credit and federal preemption are fairly clear and would likely have preserved error as to those issues. Those issues, however, are not presented to this Court on appeal. We read nothing in appellant's *pro se* motions or in the re-urging of the motion to dismiss that goes to

16

overbreadth or vagueness of the statute.  Nor do we read anything that would serve as a specific objection regarding freedom of speech.  Appellant has, therefore, failed to preserve for our review his challenges to section 32.48 in terms of overbreadth, vagueness, or freedom of speech.  Accordingly, we overrule those issues.

Free Exercise of Religion

Government action may burden the free exercise of religion, in violation of the First Amendment,[10] in two quite different ways: by interfering with a believer's ability to observe the commands or practices of his faith and by encroaching on the ability of a church to manage its internal affairs.  <u>Westbrook v. Penley</u>, 231 S.W.3d 389, 395 (Tex. 2007).  In appellant's *pro se* motions, he refers to the "exercise of one's faith."  More specifically, he raised the issue of ecclesiastical abstention in the trial court and cites to cases concerning this doctrine on appeal.  His arguments are directed at the trial court's jurisdiction over this matter, not the constitutionality of section 32.48.  So, it appears the judiciary's exercise of jurisdiction over the matter, rather than the Legislature's enactment of section 32.48, is the target of his challenge.  We, then, will address that aspect of the constitutional issue he now presents on appeal; we will determine whether the trial court's exercise of jurisdiction violated appellant's right to free exercise of religion by encroaching on the ability of his church to manage its internal affairs.

---

[10] The First Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, provides: "Congress shall make no law respecting an establishment of Religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I, XIV.

17

The Constitution forbids the government from interfering with the right of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters. See Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 708–09, 724–25, 96 S.Ct. 2372, 49 L.Ed. 2d 151 (1976). Based on this constitutionally-mandated abstention, secular courts may not intrude into the church's governance of "religious" or "ecclesiastical" matters, such as theological controversy, church discipline, ecclesiastical government, or the conformity of members to standards of morality. See In re Godwin, 293 S.W.3d 742, 748 (Tex.App.—San Antonio 2009, orig. proceeding).

The record shows that Coleman, to whom the "Abatement" was delivered, was not a member of appellant's church. That being so, the church's position on the custody matter is not a purely ecclesiastical matter over which the trial court should have abstained from exercising its jurisdiction. This is not an internal affairs issue because the record conclusively establishes that the recipient is not a member of the church. The ecclesiastical abstention doctrine does not operate to prevent the trial court from exercising its jurisdiction over this matter. We overrule appellant's final issue.

Conclusion

Having overruled appellant's issues, we affirm the judgment of conviction.


Mackey K. Hancock
Justice


18

Publish.